UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| VAN STICKNEY, | : | Case No. 3:13-cv-235 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| UNITED INSURANCE GROUP AGENCY, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS (Doc. 13)**

This civil action is before the Court on Defendant Omaha Life Insurance Company's motion to dismiss (Doc. 13), and the parties' responsive memoranda (Docs. 15, 17).[1]

Plaintiff filed the complaint against Defendants UIG and Omaha alleging six claims for relief: (1) negligence; (2) breach of fiduciary duty; (3) negligent misrepresentation; (4) fraudulent inducement; (5) reformation of contract; and (6) breach of contract.  (Doc. 1).  Subsequently, Omaha filed a motion to dismiss arguing that: (1) Omaha has no vicarious liability because the individual tortfeasors (agents of Omaha) acted outside the scope of their authority; (2) the parol evidence rule bars Plaintiff's claim for fraudulent inducement; (3) the sale of insurance does not implicate fiduciary relationships; (4) Plaintiff's claim for reformation is barred by the absence of a mutual

---

[1] Defendants include United of Omaha Life Insurance Company ("Omaha") and United Insurance Group Agency, Inc. ("UIG") (collectively, "Defendants").

mistake of fact; and (5) Plaintiff's breach of contract claim is barred by a lack of a contract. (Doc. 13).

## I. FACTS AS ALLEGED BY THE PLAINTIFF

For purposes of this motion to dismiss, the Court must: (1) view the complaint in the light most favorable to Plaintiff; and (2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

Heidi Robinson and David Wickes are employed by UIG as insurance brokers. While Robinson, Wickes, and UIG are not employees of Omaha, pursuant to Ohio Revised Code § 3911.22, after such time as they marketed Omaha insurance products to Plaintiff, they became Omaha's agents. (Doc. 1 at ¶¶ 2-3).

In 2005, Plaintiff purchased a life insurance policy on the lives of his parents, David and Brenda Stickney, from Pacific Life Insurance Company ("Pac Life" and the "Pac Life Policy") to aid in the succession planning for the family farm, Hillcrest. (Doc. 1 at ¶¶ 6-7). The Pac Life Policy provided for a $750,000 benefit and a $5,470 annual premium. (*Id*. at ¶ 9).

Subsequently, Plaintiff met Robinson who told Plaintiff that she could find a replacement life insurance policy with a lower premium payment. Plaintiff met with Robinson approximately ten times over the course of six to eight months. Robinson discussed tax planning and investment management issues with Plaintiff. She impressed Plaintiff with her knowledge, and over the course of their many meetings, Robinson cultivated Plaintiff's trust. (Doc. 1 at ¶¶ 17-20).

2

Robinson advised Plaintiff that she could find a replacement for the Pac Life Policy with the same benefit but a lower premium, between $4,000 and $4,500 per year. Relying upon Robinson's advice and guidance, Plaintiff applied to Omaha (through the "Omaha Application") for a policy with a $750,000 benefit and a monthly premium of $333.12 (*i.e.*, $3,997.44 per year). In the Omaha Application, Plaintiff specified a "payment mode" of "monthly bank draft." Plaintiff provided an Authorization for Omaha to withdraw monthly premium payments electronically from an associated checking account and supplied a voided check. The Authorization provided that the "initial premium to be paid by electronic transfer." (Doc. 1 at ¶¶ 21-24).

Robinson told Plaintiff that she had found a replacement life insurance policy from Omaha with a $750,000 benefit, an accumulating cash value, and an annual, non-variable premium of about $4,200 (the "Omaha Policy"). (Doc. 1 at ¶ 24). Robinson also told Plaintiff that UIG would facilitate a tax-free exchange so that Plaintiff could avoid negative tax consequences associated with terminating the Pac Life Policy. (*Id.* at ¶ 27).

Robinson and Plaintiff met to review the Omaha Policy. Plaintiff tendered a total of $995.72 to Robinson, as requested, to activate the Omaha Policy. The Omaha Policy, by its terms, includes and incorporates the Omaha Application. (Doc. 1 at ¶¶ 29-30).

While the Omaha Policy provided for $750,000 in coverage, it also provided that the "Annualized Planned Premium" was $8,753.33. The Omaha Policy also included conflicting terms as to whether premium payments would be made monthly or annually. (Doc. 1 at ¶¶ 31-32). Robinson explained to Plaintiff that the "Annualized Planned

3

Premium" was not the actual amount Plaintiff would pay to maintain the Omaha Policy. (*Id.* at ¶ 34). Robinson's explanations made sense, particularly since the provisions of the Omaha Policy regarding the premium calculation are too complex for a lay person to understand. (*Id.* at ¶¶ 35-45).

Plaintiff never received any written statement or invoice from Omaha for any amount due to activate or continue the Omaha Policy. (Doc. 1 at ¶ 48). After meeting with Robinson to activate the Omaha Policy, Robinson stopped communicating with Plaintiff. Plaintiff had several communications with Wickes, Robinson's alleged "supervisor," concerning whether Plaintiff was required to make further payments to activate the Omaha Policy. (*Id.* at ¶¶ 49-61). Through those communications, Wickes advised Plaintiff that premium payments could be made from the money paid to Omaha by Pac Life. (*Id.* at ¶ 54).

On December 21, 2012, Omaha cancelled the Omaha Policy in written correspondence. In its letter, Omaha advised Plaintiff that "We have discontinued the processing of your application for insurance" because Plaintiff had not paid the "Initial premium of $4293.20." (Doc. 1 at ¶¶ 62-63). Seven days later, Omaha transmitted a check to Plaintiff for $23,157.33, which was the cash surrender value of the Omaha Policy. (*Id.* at ¶ 66).

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a

4

claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

5

pleader is entitled to relief,'" and the case shall be dismissed. *Id*. (citing Fed. R. Civ. P. 8(a)(2)).

### III.  ANALYSIS

**A. Vicarious Liability**

Omaha argues that Plaintiff's claims for negligence,[2] negligent misrepresentation,[3] and fraudulent misrepresentation[4] must be dismissed because Omaha cannot be responsible for Robinson and Wickes' conduct because they acted outside the scope of their actual or apparent authority.

If Robinson, Wickes, and UIG were Omaha's agents, Omaha can only be liable for their tortious acts if they were committed within the course and scope of their actual or

---

[2] In the insurance context, an action for negligence may be based upon an insurance agent's failure to procure insurance. *Minor v. Allstate Ins. Co.*, 675 N.E.2d 550, 554 (Ohio App. 1996). An agent is liable if "as a result of his or her negligent failure to perform that obligation [to procure insurance], the other party to the [insurance] contract suffers a loss because of a want of insurance coverage contemplated by the agent's undertaking." *Carpenter v. Scherer-Mountain Ins. Agency,* 733 N.E.2d 1196, 1203 (Ohio App. 1999).

[3] Negligent misrepresentation occurs when "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Delman v. Cleveland Hts.*, 534 N.E.2d 835, 838 (Ohio 1989).

[4] To state a claim for fraudulent misrepresentation a complaint must include allegations of: "(1) a representation or, when there is a duty to disclose, a concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) an injury proximately caused by that reliance." *Stuckey v. Online Resources Corp.*, 819 F. Supp.2d 673, 682 (S.D. Ohio 2011) (citing *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998)).

6

apparent authority or if the acts were ratified by Omaha. Ohio Revised Code § 3905.20(B)(3). Because Omaha's application and policy provides that agents do not have authority to change or waive any aspect of a policy, Omaha argues that if an agent purported to change or waive a policy or term, he or she would be acting outside the course of his or her scope and authority.

Plaintiff alleges that Robinson, Wickes, and UIG acted within the scope of their agency authority, because Robinson did not modify the terms of the Omaha policy, but rather attempted to explain the terms of the Policy to Plaintiff. Omaha contends that this argument fails because: (1) if the representations were misrepresentations that were inconsistent with the policy, Robinson was acting outside the course and scope of her actual and apparent authority, and liability cannot be imputed to Omaha; and (2) if the representations were consistent with the policy, there is no misrepresentations for which Omaha could be vicariously liable.

Plaintiff maintains that Robinson convinced him that UIG could broker a life insurance policy that was the same as the Pac Life Policy with an annual premium less than $5,470. (Doc. 1 at ¶ 6). Robinson told Plaintiff that she had found such a policy from Omaha, and through the course of several months, Robinson fostered Plaintiff's expectation that a replacement policy would have an annual premium somewhere between $4,000 and $4,500. (*Id.* at ¶ 24). As a result, when Plaintiff reviewed the Omaha Policy and saw that the "Annualized Planned Premium" was $8,753.33, he was confused and alarmed. (*Id.* at ¶ 31). In response, Robinson did not alter the terms of the

7

policy. Instead, she explained to Plaintiff that the "Annualized Planned Premium" was not the amount due to Omaha. Rather, some other amount was due to Omaha. (*Id.* at ¶ 33). Given the technical nature of the alleged Omaha Policy, and Robinson's demonstrated level of expertise, Plaintiff believed Robinson's explanation. (*Id.* at ¶¶ 34-45). As further alleged in the complaint, Omaha cancelled the Omaha Policy due to Plaintiff's failure to pay the "initial annual premium of $4293.20." (*Id.* at ¶ 63). Based on the record as it stands, the Court cannot determine what Omaha actually charged as the annual premium for the Omaha Policy. Therefore, the Court cannot determine if Robinson exceeded the scope of her authority.

Moreover, Plaintiff's claims of vicarious liability against Omaha are not entirely dependent on Robinson's "alteration" of the Omaha Policy. Plaintiff argues that Robinson and Wickes – and, by extension, UIG and Omaha – failed to properly communicate with Plaintiff to ensure that the Omaha Policy was activated and paid. (Doc. 1 at ¶¶ 47-62). Relying on Omaha's December 21, 2012 letter, stating that the annual premium was $4,293.20, the Policy met Plaintiff's expectations, and the only reason it was cancelled was as the result of alleged careless communication between Omaha and Plaintiff. (*Id.*) Moreover, Omaha was holding more than $20,000 of Plaintiff's money that could presumably have been used to cover the initial annual premium. (*Id.* at ¶ 62).

8

In sum, at this stage in the litigation Plaintiff has alleged sufficient facts to maintain a cause of action against Omaha for the alleged tortious acts of Robinson, Wickes, and UIG.

### B. Reformation and the Parol Evidence Rule

Next, Omaha argues that Plaintiff's claim for fraudulent inducement should be dismissed because the parol evidence rule generally bars fraudulent inducement of a written contract and because fraudulent inducement cannot be based on a promise.[5]

"Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions." *Astor v. IBM Corp.*, 7 F.3d 533, 539 (6th Cir. 1993). Plaintiff suggests that Omaha ignores the language "integrated into an *unambiguous* written contract." (emphasis added). Specifically, Plaintiff argues that the language of the Omaha Policy is so convoluted that it is impossible for a layperson to understand what the Policy means with respect to premium calculation. Additionally, Plaintiff argues that the Policy is internally inconsistent with respect to whether premium payments are due on a monthly basis or an annual basis. Therefore, when Robinson represented to Plaintiff that the annual premium associated with the

---

[5] "[T]he elements of fraudulent inducement are: (1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction; (3) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on the presentation; (5) justifiable reliance; and (6) injury proximately caused by the reliance." *Simon Property Group v. Kill*, No. 1-09-30, 2010 Ohio App. LEXIS 1250, at ¶ 17 (Ohio App. Apr. 5, 2010).

Omaha Policy was about $4,200 per year, and that it would be billed on a monthly basis, those representations were consistent with the ambiguous terms of the Omaha Policy.

Next, Plaintiff argues that Robinson's fraudulent representations were not promises, they were factual misstatements. Specifically, Robinson told Plaintiff that under the terms of the Omaha Policy as drafted, the annual premium was about $4,200 per year. (Doc. 1 at ¶ 33). Plaintiff argues that because the Policy was confusing and incomprehensible to a layperson, Robinson's statements were factual and plausible. Robinson was not promising to do something in the future; rather she was making statements about an ambiguous contract.[6]

The Court finds that whether or not the contract was unambiguous is a factual question that this Court cannot determine at this stage in the litigation. Accordingly, Plaintiff has stated a claim for reformation and the Court declines to dismiss the fraudulent inducement claim.

### C. Fiduciary Relationship

No fiduciary relationship exists unless both parties understand that "a special trust or confidence has been reposed in the relationship." *Scotts Co., LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 738 (S.D. Ohio 2009). An insurance sales agency owes its

---

[6] Importantly, the parol evidence rule does *not* prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement. *Drew v. Christopher Constr. Co., Inc.*, 41 N.E.2d 1018, paragraph two of the syllabus (Ohio 1942). "[T]he rule excluding parol evidence of collateral promises to vary a written contract does not apply where such contract is induced by promises fraudulently made, with no intention of keeping them." 37 American Jurisprudence 2d at 623, Section 452. *See also Galmish v. Cicchini*, 734 N.E.2d 782, 790-91 (Ohio 2000).

customers a duty to exercise good faith and reasonable diligence in acquiring its customer's insurance coverage. *Slovak v. Adams*, 753 N.E.2d 910, 915 (Ohio App. 2001). Whether or not a fiduciary relationship exists depends on the facts and circumstances of each case. *Depugh v. Ohio Dep't of Commerce Div. of Real Estate*, 715 N.E.2d 622, 625(Ohio App. 1998). While generally the relationship between an insurance agent and his client is not a fiduciary relationship, a fiduciary relationship can arise from such an informal relationship when both parties understand that a special trust or confidence has been reposed. *Ed Schory & Sons, Inc. v. Soc'y Natl. Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996).

Omaha argues that Plaintiff's claim for breach of fiduciary duty should be dismissed because: (1) the relationship between an insurance agent and an insured is generally not considered a fiduciary relationship; (2) Plaintiff did not plead that UIG, Robinson, or Wickes knew that they were entering into a fiduciary relationship; and (3) Omaha is not vicariously liable for breaches of fiduciary duty.

First, Plaintiff maintains that a fiduciary relationship existed between him and Robinson, because Robinson advised him on his overall financial planning over the course of numerous meetings. Specifically, Plaintiff and Robinson meet ten times over the course of six to eight months to discuss Plaintiff's financial planning. (Doc. 1 at ¶ 19). They discussed life insurance, but they also discussed tax planning, investment management, and succession planning. (*Id*.) Over the course of their meetings,

11

Robinson cultivated a trusting relationship.[7] (*Id.* at ¶ 20).  Accordingly, Plaintiff argues that he should be allowed to pursue discovery to evidence whether the incidents of his relationship with Robinson constitute the "without more" contemplated by the *Nichols* case. *See, e.g., Nichols v. Schwendeman*, No. 07AP-433, 2007 Ohio App. LEXIS 5776, at ¶ 15 (Ohio App. Dec. 11, 2007) (without more, "the relationship between an insurance agent and an insured is not a fiduciary relationship.").[8]  Whether or not there was any heightened relationship in this case is a factual issue.  While it is rare that a plaintiff can establish such a relationship, Plaintiff has stated sufficient facts to survive a motion to dismiss.

Next, Robinson explained to Plaintiff what the terms of the Policy "really" meant. Plaintiff alleges that UIG (through Robinson) breached its fiduciary duties by: overpromising the terms of the life insurance it could broker for Plaintiff, representing that it had secured a replacement policy for a lower premium, misrepresenting that the Omaha Policy provided for an annual non-variable premium payment of about $4,200, selling Plaintiff a life insurance policy that provided no financial advantage or greater benefit over the Pac Life Policy, arranging for a 1035 exchange that would result in a

---

[7] "[A]n insured's reliance on his insurance agent is not sufficient, by itself, to establish a fiduciary relationship." *Troski v. MTL Ins. Co.*, No. 2:09cv599, 2010 U.S. Dist. LEXIS 115655, at *36 (S.D. Ohio Oct. 29, 2010).  However, Plaintiff has alleged that he was not simply relying on his insurance agent.  He met with Robinson 10 times and expressly asked her to explain the terms of his policy upon recognizing that the terms were inconsistent with Robinson's representations.  (Doc. 1 at ¶ 33).

[8] Importantly, this issue was before the *Nichols* Court on a motion for summary judgment, not a motion to dismiss.

12

financial disadvantage for Plaintiff, failing to provide written statements or invoices from Omaha or UIG, demanding payment without providing written justification for the payment, failing to guard against or warn of the cancellation of the Omaha Policy, misrepresenting that UIG would either reinstate the Pac Life Policy or find a less expensive replacement policy, and failing to secure a replacement policy after the cancellation of the Omaha Policy. (Doc. 1 at ¶ 83). Plaintiff maintains that none of UIG's alleged breaches of fiduciary duty have anything to do with Robinson's alleged alteration of the Omaha Policy.

Accordingly, Plaintiff has alleged sufficient facts to maintain a claim for breach of fiduciary duty against Omaha.

### D. Reformation

"Reformation of an insurance policy may be had, in general, where by reason of fraud, inequitable conduct, or mutual mistake, the policy as written does not express the actual and real agreement of the parties." *Springfield Impregnators v. Ohio State Life Ins. Co.*, No. 3090, 1994 Ohio App. LEXIS 1168, at ¶ 25 (Ohio App. Mar. 23, 1994). Reformation is generally only appropriate where "both parties understood the contract as the party seeking reformation alleges." *Cuthbert v. Trucklease Corp.*, No. 03AP-662, 2004 Ohio App. LEXIS 4006, at ¶ 33 (Ohio App. Aug. 24, 2004). However, an insurance contract may be reformed when the mistake involved is only a unilateral one where such a mistake affects the insurance policy to such an extent that the contract is not a correct integration of the parties' agreement. *Snedegar v. Midwestern Indem. Co.*, 541

N.E.2d 90, 96 (Ohio App. 1988). The *Snedegar* Court noted that "where one party believes the writing correctly integrates the agreement and the other knows it does not, reformation may be a proper remedy, even though the mistake of writing the contract was not a material one." *Id.* (citing *Ohio Farmers Ins. Co. v. Clinton Cty. Nat'l Bank & Trust Co.*, 220 N.E.2d 381 (Ohio Common Pleas 1964)).

Omaha argues that contract reformation is not appropriate because the contracting parties have not made a mutual mistake of fact. However, Plaintiff maintains that the Omaha Policy should be reformed because it was procured through fraudulent inducement. Plaintiff alleged that he formed an agreement with Omaha for a life insurance policy under which the material terms included a $750,000 benefit and a $4,200 annual premium. (Doc. 1 at ¶ 28). Plaintiff argues that the Omaha Policy – to the extent that it does not provide for a $750.000 benefit and a $4,200 annual premium – was obtained through fraudulent inducement. (*Id*. at ¶¶ 91-100). It is unclear, based on the facts of this case, whether reformation is available in these circumstances.

Accordingly, the Court declines to dismiss Plaintiff's claim for reformation at this stage in the litigation.

### E. Breach of Contract

Finally, Omaha argues that it never formed a contract with Plaintiff, so Omaha could not have breached a contract. Specifically, Omaha argues that Plaintiff failed to tender the requisite consideration (*i.e.*, the policy premium).

There is conflicting evidence (and allegations) as to the amount of the annual premium associated with the Policy when the payment was due. The Policy states that the "Annualized Planned Premium" is $8,753.33. (Doc. 1 at ¶ 63). However, Omaha's December 21, 2012 letter states that it was canceling the Omaha Policy because plaintiff did not tender the initial $4,293.20 premium. The Court declines to dismiss the breach of contract claim for lack of consideration when it is entirely unclear what consideration was due and when it was due. Thus, the Court cannot find that Plaintiff failed to tender adequate consideration.

Moreover, Plaintiff maintains that better communication between him and Omaha would have led to payment of whatever premium was actually required to activate the Omaha Policy since Omaha was holding over $20,000 of Plaintiff's money. In fact, Wickes allegedly told Plaintiff that premium payments could be made from the money transferred from the Pac Life Policy. (Doc. 1 at ¶ 64). While Plaintiff also alleged that Wickes informed Plaintiff additional payments were necessary, these conflicting statements raise factual disputes. (Doc. 1 at 50, 52, 55, 57).

Therefore, Plaintiff has alleged sufficient facts to state a claim for breach of contract.

### IV.  CONCLUSION

Accordingly, for the reasons stated here, Defendant's motion to dismiss (Doc. 13) is **DENIED**.

**IT IS SO ORDERED**.

Date:  1/28/2014                                                                  */s/ Timothy S. Black*
                                                                                          Timothy S. Black
                                                                                          United States District Judge