UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

VAN STICKNEY,               :

                        :     Case No. 3:13-cv-235

        Plaintiff,        :

                        :     Judge Timothy S. Black

vs.                      :

                        :

UNITED INSURANCE GROUP   :

AGENCY, INC., *et al.*,       :

                        :

        Defendants.     :

**SEALED ORDER DENYING DEFENDANT UNITED INSURANCE GROUP,
INC.'S MOTION FOR SUMMARY JUDGMENT (Doc. 39)**

This civil action is before the Court on Defendant United Insurance Group

Agency, Inc.'s Motion for Summary Judgment (Doc. 39) and the parties' responsive

memoranda (Docs. 53, 55, 58).

## I.      STATEMENT OF THE CASE

Plaintiff Van Stickney filed this action on July 22, 2013 against United Insurance

Group Agency, Inc. ("UIG") and United of Omaha Life Insurance Company ("Omaha")

alleging six claims for relief: (1) negligence; (2) breach of fiduciary duty; (3) negligent

misrepresentation; (4) fraudulent inducement; (5) reformation of contract; and (6) breach

of contract. (Doc. 1).[1] Plaintiff applied to Omaha for a Joint and Last Survivor Flexible

Premium Adjustable Life Insurance Policy as a replacement for a life insurance policy on

---

[1] Plaintiff settled with Omaha and dismissed his claims against Omaha on January 20, 2015.
(Doc. 50). The breach of contract and reformation of contract claims were asserted only against
Omaha. (Doc. 1 at ¶¶ 101-15). Accordingly, only the four tort claims remain pending against
UIG.

the lives of his parents issued by Pacific Life Insurance Company.  Plaintiff applied for the policy through Heidi Robinson and David Wickes, independent insurance agents authorized to sell Omaha policies and associated with UIG.

Over the course of several months, Robinson and Wickes provided Plaintiff with multiple policy illustrations and eventually delivered a Joint and Last Survivor Flexible Premium Adjustable Life Insurance Policy number BU1371786.  In December 2012, Omaha indicated by letter that it had discontinued the processing of Plaintiff's application based on his failure to pay the "initial premium of $4,293.20."  (Doc. 43, Ex. 19).  On January 28, 2014, the Court denied Omaha's motion to dismiss and remarked that "the Court cannot determine what Omaha actually charged as the annual premium."  (Doc. 18 at 8).

UIG now moves for summary judgment.  The parties have submitted the policy illustrations and the prospective policy provided to Plaintiff.  Although these documents list multiple premium amounts that fluctuated during the course of an underwriting process that lasted several months, there is no reference to a $4,293.20 premium.  The parties and their respective witnesses have not provided the Court with any indication of where this premium amount came from or what was the actual premium necessary for Plaintiff to activate his policy with Omaha.  This is just one of many factual disputes that preclude the resolution of this action on summary judgment.

## II. UNDISPUTED FACTS[2]

1. Heidi Robinson and David Wickes were agents of Omaha. (Doc. 1 at ¶ 3).

2. Plaintiff executed a Settlement Agreement with Omaha on December 30, 2014. (Doc. 39, Ex. L).

3. In the Settlement Agreement, "UNITED OF OMAHA" is expressly defined to include all of its agents and associates. (Doc. 39, Ex. L at ¶ 1(b)).

4. Plaintiff did not comparatively shop around for rates on life insurance policies other than the policy presented to him by Robinson. (Doc. 40 at 66-67).

5. Robinson and Wickes describe themselves as independent insurance agents, and they contract with multiple insurance carriers to sell life and health insurance. (Doc. 43 at 8-9; Doc. 44 at 15).

6. The delivery of the Omaha policy occurred in Robinson's house, not at a location controlled by UIG. (Doc. 43 at 98).

7. Plaintiff has not provided a standard of care life insurance agent expert and the only expert that Plaintiff has provided is an economist.

8. Plaintiff signed a separate document acknowledging that his parents had been rated up. (Doc. 39, Ex. G).

9. Plaintiff received and signed a document stating the Premium Outlay and Annualized Premium Outlay on the Omaha policy. (*Id.*)

---

[2] The Court's Standing Order Governing Civil Motions for Summary Judgment provides that "[t]here shall be attached to every opening brief in support of a motion for summary judgment a document entitled 'Proposed Undisputed Facts,' which set forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." UIG's Proposed Undisputed Facts do not address the great majority of the basic factual allegations underlying this action, including many allegations set forth in the statement of facts section of its motion for summary judgment. (Doc. 46). Accordingly, the Court construes the omission of these factual allegations from the Proposed Undisputed Facts to mean that UIG views them as either not material or in dispute. (Doc. 39 at 2-8).

## III. ADDITIONAL BACKGROUND

Plaintiff Van Stickney is a teacher who holds a master's degree. (Doc. 40 at 15, 21). Plaintiff also owns a grain farm and a landscaping business with sixteen part-time, seasonal employees. (*Id.* at 24, 37). Plaintiff's parents, David and Brenda Stickney, own a cash grain and cattle farm. (*Id.* at 42).

In 2005, Plaintiff purchased a last-to-die life insurance policy from Pacific Life Insurance Company (the "Pac Life policy"). (Doc. 40 at 57-58). The Pac Life policy had an annual premium of $5,470 and a $750,000 death benefit, payable after both his parents passed away. (*Id.* at 58). The Pac Life policy also contained an investment component that varied based on the market interest rate. (Doc 39, Ex. D at ¶ 7; Doc. 40 at 66).[3] Wickes described the Pac Life policy as a variable life insurance policy. (Doc. 39, Ex. D at ¶ 6; Doc. 44 at 38-39). However, Wickes only saw a copy of an annual statement for the Pac Life policy and not a copy of the full policy. (Doc. 44 at 37-38). Wickes could tell by the name of the policy listed on the policy statement that it was a variable life insurance policy. (*Id.*) Wickes identified the January 2009 policy statement as the statement that Plaintiff provided to him. (*Id.* at 49-50).

David Wickes became affiliated with UIG in 2009. (Doc. 44 at 11). In addition to selling insurance policies, Wickes has the title of district sales manager. (*Id.*) As district

---

[3] The parties did not file a copy of the Pac Life policy as an exhibit in summary judgment briefing. The record does contain one page of a five-page annual statement dated February 24, 2011 (Doc. 39, Ex. K) and two pages of a five-page annual statement dated January 9, 2009 (Doc. 43, Ex. 2). Attached to the complaint were copies of the Pac Life application dated January 6, 2005, a one page Pac Life policy delivery requirement dated March 3, 2005, and an illustration dated December 14, 2004. (Doc. 1, Exs. A, B, C). The illustration indicates that the policy is a Last Survivor Flexible Premium Adjustable Life Insurance Policy. (*Id.*, Ex. C).

sales manager, Wickes' responsibilities include recruiting, interviewing, and training new hires, and supervising all of UIG's agents in Ohio. (*Id.* at 11-14). Wickes meets with potential recruits who are identified by the company, and he has the authority to sign them as insurance agents. (*Id.* at 14). Wickes is one of the several managers to provide initial training to new recruits. (*Id.*) Wickes reports to UIG's national sales director at the company's head office in Michigan. (*Id.* at 21). Wickes' compensation depends on his own sales as well as the sales of all agents assigned to him. (*Id.* at 12-13, 24).

Heidi Robinson began her affiliation with UIG in October 2010 when she first became licensed to sell insurance, and she has not been associated with any other insurance sales agency. (Doc. 43 at 14). Wickes was Robinson's first contact with UIG and Wickes provided on-the-job training and guidance to Robinson. (*Id.* at 25). Robinson also received initial training just after she became affiliated. (*Id.* at 18-19). Robinson was elevated from Agent I to Agent II at the request of Wickes and upon the approval of other individuals within the company. (*Id.* at 29). Robinson has received cash incentives and trips for promoting particular products. (*Id.* at 29-30).

Robinson and Wickes are paid directly by UIG, not the individual insurance carriers. (Doc. 43 at 16-17; Doc. 44 at 15). UIG provides its agents such as Robinson and Wickes with sales leads for prospective insureds, sales support for processing applications, and marketing materials. (Doc. 43 at 23-24; Doc. 44 at 20-21). Robinson and Wickes operate under the terms of a written Independent Insurance Agent Contract with UIG. (Doc. 39, Ex. D1). Pursuant to the contract, Robinson and Wickes are identified as non-exclusive independent contractors. (*Id.* at ¶ 2). Pursuant to the contract, UIG may

prescribe standards of conduct and procedures for its agents, and UIG retains the ultimate right to reject applications for insurance solicited by its agents without specifying cause. (*Id.* at ¶¶ 2, 15). The contract also governs procedures such as the handling of confidential information and money, permits UIG to unilaterally change the commission structure, and requires agents to maintain minimum sales levels. (*Id.* at ¶¶ 6-8, 13, 22).

UIG provided Robinson and Wickes with office space and computers from 2009 to 2013 in Columbus, Ohio. (Doc. 43 at 20-21; Doc. 44 at 18-20). At some point, UIG moved to a smaller office across the street and then eliminated the office completely. (Doc. 44 at 19-20). Prior to the move, UIG provided a full-time administrative assistant and office supplies. (*Id.*) UIG continued to provide computers after the move, but agents had to provide their own computers after the office space was discontinued in 2013. (*Id.* at 20). Plaintiff met with Robinson and Wickes at the UIG office in Columbus several times. (Doc. 40 at 75, 81, 185-86; Doc. 43 at 76).

The parties agree that Plaintiff and Robinson met through a mutual friend, Doug Fischer, but dispute when and where they first met. Plaintiff alleges he first met Robinson in 2009 or 2010 at Fischer's home. (Doc. 40 at 65). Robinson asserts that the two first met a Fischer's wedding in 2010 or 2011. (Doc. 43 at 30). After interacting only on a social basis, Plaintiff reached out to Robinson about insurance in the summer of 2011. (*Id.* at 30-31).

Plaintiff's first meeting with Robinson occurred at the UIG offices in Columbus. (Doc. 40 at 75, 81, 185-86). Plaintiff testified that he met with Robinson about once every two weeks. (*Id.* at 80-81, 83). Robinson began bringing Wickes to the meetings

because Wickes had more knowledge about the investment aspects of the life insurance policies.  (*Id.* at 81).

Plaintiff testified that he consulted Robinson to see if he could get a life insurance policy on his parents with a $750,000 death benefit for less than the $5,400 he paid for the Pac Life policy.  (Doc. 40 at 63-64, 75).  Plaintiff testified that he made clear to Robinson and Wickes that he did not want to pay more money than he did on his Pac Life policy.  (*Id.* at 88).  Both Robinson and Wickes repeatedly testified that Plaintiff only asked them "if he could do better" than the Pac Life policy.  (Doc. 43 at 34-35, 37, 40-41; Doc. 44 at 32-35, 37).  Robinson testified that she understood this to mean that Plaintiff sought a safer investment because the variable interest rate on the Pac Life policy had recently caused Plaintiff to lose money.  (Doc. 43 at 35-36).  Accordingly, Robinson sought to locate a policy with a guaranteed interest rate.  (*Id.* at 36).  However, Robinson also testified that Plaintiff never said that he was concerned about the cash value of the Pac Life policy or that he thought it was unsafe.  (*Id.* at 39-40).

Wickes testified that he was "not sure" what Plaintiff meant when he asked "if he could do better."  (Doc. 44 at 34).  However, Wickes also sought to find Plaintiff a policy with more guarantees.  (*Id.* at 36-37).  Wickes also testified that Plaintiff only said that he had the Pac Life policy for the death benefit and did not express any other purpose in holding the policy.  (*Id.* at 40-41).  Wickes saw a copy of a Pac Life policy statement, but Wickes never saw or requested to see a copy of the policy itself.  (*Id.* at 37).

On September 9, 2011, Robinson and Wickes prepared the first of several policy illustrations for Plaintiff for an Omaha Joint and Last Survivor Flexible Premium

Adjustable Universal Life Insurance Policy.  (Doc. 43, Ex. 4).  The policy illustrations

defined a number of keys terms in identical fashion:

> Guaranteed Universal Life Survivor:  Guaranteed Universal Life Survivor
> is an individual joint universal life insurance policy that features flexible
> premiums to age 120 and an adjustable death benefit.  This policy insures
> the lives of two persons and pays the death benefit upon the death of the
> last insured to die while the policy is still in force.  The policy provides a
> No-Lapse Protection, which means the policy's death benefit will remain in
> force, for as long as certain requirements described in the policy are met,
> but no longer than the policy's maturity date.

> Premium Outlay:  The Premium Outlay is the amount of premium assumed
> to be paid out of pocket for the mode selected, including any Section 1035
> rollover amounts and any additional Premium payments made.  The
> Premium Outlay for policy year 1 reflects either (a) the annualized
> requested premium, (b) the minimum premium required to issue the policy,
> (c) the annualized requested premium, increased by an amount necessary to
> meet the minimum premium required to issue the policy after applying any
> first year additional Premium payments and any Section 1035 rollover
> amounts, or (d) the maximum allowable premium that will not violate the
> guideline maximum single premium, whichever is applicable.

> Annualized Premium Outlay:  This is the amount of premium assumed to
> be paid out of pocket for the mode selected and shown on an annualized
> basis.  This amount includes any Section 1035 rollover amounts and any
> additional Premium payments made.

> Lifetime No-Lapse Protection:  The annualized premium required to
> guarantee a $750,000 death benefit to policy year 58, the policy year in
> which the youngest insured attains the age of 120, is $[].

> Short-Term No-Lapse Protection:  The yearly premium required to
> guarantee a $750,000 death benefit to policy year 20 is $[] providing
> premiums are paid continuously when due, no policy loans or withdrawals
> are taken, and the other requirements of the policy are met.  This is the
> Short-Term No-Lapse Protection of the policy.

(*Id.*)  The Premium Mode determined how often payments were required.  Selecting an

annual premium mode would result in a slight discount over monthly payments.  (Doc. 43

at 51-52).  The final page of every illustration provided a summary of the amounts of the benefits and premiums, with the following labels:  Total Initial Death Benefit, Premium Outlay, Lifetime Level Premium, and Short-Term Level Premium.  (*Id.*, Ex. 4 at 10).[4] The Death Benefit was set at $750,000 in every illustration and policy.  The Premium Outlay, Lifetime Level Premium, and Short-Term Level Premium varied between each illustration.  The Death Benefit, Premium Outlay, and information about the insureds, including their age, sex, and risk classification, were listed on each page of the illustrations.  All illustrations and policies also provided a guaranteed interest rate of 3.00%.

The illustrations contained two tables, a summary table and a comprehensive table.  Each table listed the Premium Outlay, Premium Mode, and 1035 Exchange Amount at the top of the page, in addition to the insureds' information and Death Benefit. The summary table listed information for policy years 5, 10, 20, and 30.  (Doc. 43, Ex. 9 at 8).  The summary table also had signature lines for the application and agent.

The comprehensive table occupied several pages of the illustrations and listed certain information for policy years 1-58.  (Doc. 43, Ex. 9 at 9-11).  This information included the insureds' ages, the Annualized Premium Outlay, the end of year accumulation value, the end of year surrender value, and the end of year death benefit.

---

[4] The dollar amount of the Lifetime Level Premium and Short-Term Level Premium were reflected in the definitions of Lifetime No-Lapse Protection and Short-Term No-Lapse Protection, respectively.

The latter three categories were listed with a guaranteed value at 3.00% interest and non-guaranteed value at the market interest rate.

The ability to pay either the Lifetime Level Premium or Short-Term Level Premium is what gives the policy its name as flexible. (Doc. 44 at 57). Robinson and Wickes both testified that the Short-Term Level Premium could not be paid in the first year. (Doc. 43 at 54-55; Doc. 44 at 58). Robinson testified that the policyholder could begin paying the Short-Term Level Premium in year two. (Doc. 43 at 55). However, Wickes did not know when the policyholder could begin paying only the Short-Term Level Premium. (Doc. 44 at 58).

Robinson and Wickes prepared the September 2011 illustration at the UIG office on a company computer. (Doc. 44 at 55). This illustration rated the insureds, identified as Mr. and Mrs. Client, as preferred non-tobacco. (Doc. 43, Ex. 4 at 2). The Premium Outlay was $333.14 with a monthly Payment Mode, the Lifetime Level Premium was $8,315.64, and the Short-Term Level Premium was $4,107.96. (*Id.* at 4, 8, 10). The tables of information were left blank. (*Id.* at 9). Wickes testified that the $333.14 monthly Premium Outlay listed on the September 2011 illustration corresponded to the Lifetime Level Premium. (Doc. 44 at 59).

Robinson and Wickes met with Plaintiff on September 21, 2011 to review the policy illustration. (Doc. 44 at 43-45). Wickes took handwritten notes at this meeting. (Doc. 43, Ex. 1). Wickes wrote "750K on parents; was paying 5400" and below that was the number "$4,000." (*Id.*)

Plaintiff submitted his Omaha application on December 22, 2011. (Doc. 40 at 95-96, Ex. A). Plaintiff requested a $750,000 death benefit and a $333.12 premium. (*Id.*, Ex. A at 1). The application had payment mode options of annual, semiannual, quarterly, and monthly bank draft. (*Id.*) Plaintiff selected monthly bank draft. (*Id.*) Plaintiff also completed a form authorizing Omaha to make monthly bank withdrawals for all premium payments, including the initial premium, and attached a voided check. (*Id.* at 10). Plaintiff indicated on the application that he was applying for the policy to replace the Pac Life policy through a tax-free 1035 exchange. (Doc. 40, Ex. A at 2; Doc. 43 at 63). Further, Plaintiff wrote on the application that he sought to replace his Pac Life policy because it was "too expensive." (Doc. 40, Ex. A at 17).

Robinson and Wickes testified that if Omaha had issued a policy as requested in the application, then the initial monthly premium of $333.12 would have been automatically withdrawn from the designated bank account. (Doc. 43 at 65-67; Doc. 44 at 64). Robinson testified that she had never seen an insurance carrier reject the payment mode selected by a prospective insured on an application. (Doc. 43 at 62). The policyholder could only change the payment mode by submitting a form to the insurance carrier. (Doc. 44 at 63).

On April 18, 2012, Robinson received an email from Omaha in response to Plaintiff's application. (Doc. 43, Ex. 6). The email indicated that Plaintiff's parents had both been "rated up" based on their medical records. (Doc. 43 at 72). This meant that instead of the preferred rating indicated on the application, Plaintiff's father was classified as table 2, non-tobacco and Plaintiff's mother was standard, non-tobacco. (*Id.*,

Ex. 6).  The email from Omaha did not state the new premium, but Robinson and Wickes could determine that based on the new ratings.  (Doc. 43 at 72; Doc. 44 at 68).  Robinson called Plaintiff to tell him that his parents had been rated up and testified that Plaintiff understood that the policy would be more expensive, but Robinson did not tell Plaintiff what the new premium was during that phone call.  (*Id.* at 72-73).

On April 22, 2012, Plaintiff met with Robinson and Wickes at the UIG office in Columbus to discuss the policy offer from Omaha.  (Doc. 43 at 76).  Plaintiff testified that Robinson told him that the premium with Omaha was lower than the premium on his Pac Life policy.  (Doc. 40 at 97).  Plaintiff could not recall the exact amount that Robinson told him, but estimated that Robinson said the premium would be approximately $4,500.  (*Id.*)  Plaintiff understood that the premium would be higher because his parents were rated up, but testified that Robinson told him the premium had only increased from $4,200 to $4,500.  (*Id.*)

Robinson testified that Wickes prepared a new illustration in advance of the April 2012 meeting and that she explained to Plaintiff the new premium would be approximately $8,700.  (Doc. 43 at 74-76).  However, a copy of this illustration was not made part of the record.  Robinson also testified that Plaintiff indicated the new premium from Omaha was high, but that he ultimately agreed to the policy and Robinson began the process to have it issued.  (*Id.*)  Robinson testified that Plaintiff requested the payment mode be changed from monthly to annual.  (*Id.* at 82).

At the April 22, 2012 meeting, Plaintiff signed a 1035 Exchange Notice.  (Doc. 40, Ex. B).  The Notice provides "I understand that Policy Number . . . as accepted by me

differs from my original application for insurance with respect to the following amendments," which then states that instead of preferred, non-tobacco ratings, Plaintiff's father was issued as table 2, non-tobacco and Plaintiff's mother was issued as standard, non-tobacco. (*Id.*) The 1035 Exchange Notice does not list the new premium. (*Id.*)

On June 11, 2012, another policy illustration was created. (Doc. 43, Ex. 9). Wickes testified that he prepared the illustration with Robinson in the same manner as the September 2011 illustration, specifically, at the Columbus office on a UIG computer. (Doc. 44 at 75). However, Robinson testified that she did not prepare the illustration and had never seen it before. (Doc. 43 at 80).

The June 2012 illustration provided for a $750,000 death benefit and rated Plaintiff's father as table 2(B) 150% and Plaintiff's mother as standard non-tobacco. (Doc. 43, Ex. 9). The Premium Outlay was $8,753.33 and the Payment Mode was annual. (*Id.* at 8). The illustration also provided that the 1035 Exchange Amount was $23,157 and this was added to the Premium Outlay to create an Annualized Premium Outlay of $31,910 in policy year 1, which was reflected in the comprehensive table. (*Id.* at 9). The Annualized Premium Outlay for all other policy years was $8,753. (*Id.*) The Lifetime Level Premium was $8,753.33 and the Short-Term Level Premium was $4,543.02. (*Id.* at 4, 12). By comparison, the September 2011 illustration, which rated Plaintiff's parents as preferred non-tobacco, listed a monthly Premium Outlay of $333.12, a Lifetime Level Premium of $8,316.64, and a Short-Term Level Premium of $4,107.96. (*Id.*, Ex. 4 at 4, 10). According to these illustrations, the no-lapse protection premiums increased approximately $400 based on Plaintiff's parents being rated up. Plaintiff

testified that Robinson had informed him that the annual premium had increased to approximately $4,500 after his parents were rated up. (Doc. 40 at 97).

Robinson and Wickes both testified that the Premium Outlay listed on the June 2012 illustration reflected "the annualized requested premium," which is one of the four possibilities listed in the definition of Premium Outlay. (Doc. 43 at 83; Doc. 44 at 78). Another possible value for the Premium Outlay was "the minimum premium required to issue the policy," a number that Wickes testified that he did not how to calculate. (Doc. 44 at 78).

On June 20, 2012, Omaha issued Plaintiff a Joint and Last Survivor Flexible Premium Adjustable Life Insurance Policy. (Doc. 40, Ex. K; Doc. 43 at 86-87). The key terms of the Omaha policy were listed in the introductory pages under the heading Policy Data. (Doc. 40, Ex. K at ii). Plaintiff's father was rated standard non-tobacco 150% and his mother was rated standard non-tobacco. (*Id.*) The Annualized Planned Premium and Planned Premium were $8,753.33, the Additional Premium at Issue was $23,157.33, the payment mode was annual, and the death benefit was $750,000. (*Id.*) The Short-Term No-Lapse Protection Monthly Premium was $545.64 and the Lifetime No-Lapse Protection Monthly Premium was $856.91. (*Id.*) The Omaha policy defined "Planned Premium" as "the premium payments you plan to make under this policy. The initial premium you plan to make is shown as the 'Planned Premium' in the Policy Data section of the Data Pages." (*Id.* at 3). The policy also provided:

Planned Premiums may be paid annually, semi-annually, quarterly or at other intervals we offer. The Planned Premium and payment Mode you selected is shown in the Policy Data section of the Data Pages. After the first policy anniversary, you may change the Planned Premium by Written Request once each Policy Year.

You may also make additional premium payments. The amount of any additional premium paid with the initial Planned Premium is shown in the Policy Data section of the Data Pages.

Flexible Premiums are allowed until the Maturity Date.

(*Id.* at 4-5). Robinson testified that Plaintiff needed to pay $8,753.33 in the first policy year before he could choose to pay the lesser premium. (Doc. 43 at 89).

Omaha also provided Robinson with Delivery Instructions, which listed July 20, 2012 as the final delivery date. (Doc. 43, Ex. 11). However, Robinson did not meet with Plaintiff before July 20, 2012 and received an extension from Omaha. (*Id.* at 88-89). The Delivery Instructions informed Robinson that "before the policy is delivered, please collect $8,753.33 for the initial premium due." (*Id.*, Ex. 11). Omaha mailed the policy to UIG, and UIG forwarded the policy to Robinson. (Doc. 44 at 83).

On July 19, 2012, Omaha created a revised policy illustration and forwarded it to Robinson, through UIG. (Doc. 40, Ex. H; Doc. 44 at 85). The cover page stated that the revised illustration was presented by Robinson and listed the address of UIG's home office in Michigan. (Doc. 40, Ex. H at 1). Robinson received a second copy of the Delivery Instructions around July 30, 2012. (Doc. 43, Ex. 12). Wickes testified that Omaha created the July 2012 revised illustration and it was part of the documents that Robinson was required to provide to Plaintiff at the delivery. (Doc. 44 at 86). Robinson,

on the other hand, could not explain from where the revised illustration came.. (Doc. 43 at 91-93).

The font and formatting of the July 2012 revised illustration differed from the June 2012 illustration, but the content and numbers were otherwise almost identical. (Doc. 40, Ex. H; Doc. 43, Ex. 9). The July 2012 revised illustration provided the same $8,753.33 Premium Outlay with an annual payment mode. (Doc. 40, Ex. H at 10). However, the July 2012 revised illustration listed the Lifetime Level Premium as $8,566.74 and the Short-Term Level Premium as $4,406.81. (*Id.* at 13). These premiums were $8,753.33 and $4,543.02, respectively, in the June 2012 illustration. (Doc. 43, Ex. 9 at 12).

On August 7, 2012, Robinson met with Plaintiff to deliver the Omaha policy. (Doc. 43 at 94). The delivery occurred at Robinson's house because Robinson did not have sufficient time to reserve office space. (*Id.* at 95). Robinson provided Plaintiff with a copy of the July 2012 revised illustration. (Doc. 40 at 155).

Plaintiff signed the July 2012 revised illustration on August 7, 2012. (Doc. 40, Ex. D). Plaintiff also signed an amendment to the policy application acknowledging that his parents had been rated up to standard non-tobacco and rate class two. (*Id.*, Ex. G).

Plaintiff testified that he read the July 2012 revised illustration and specifically asked Robinson to explain the difference between the Premium Outlay of $8,753.33, Lifetime Level Premium of $8,566.74, and Short-Term Level Premium of $4,406.81 that were listed on the final page. (Doc. 40 at 100-03, 164-68, Ex. H at 13). Plaintiff testified:

[B]efore I signed any documents, I seen to where we have different numbers that are skewed from the top of the page. We have at the very top of the page $8,753.33 where it says premium outlay. Then where it says Lifetime Level Premium right underneath the line that says $8,566.74, which is different from the premium outlay. And then there was this Short-Term Level Premium $4,406.81. I questioned to Robinson, I said, time out. I'm being told the 44, $4,500 number, I'm seeing three different numbers here. What is my annual premium that I am going to pay year in, year out? Because I see on the other page that it's different than what you're telling me. These numbers here are different to where I wanted to know what's short-term, what's lifetime, what the premium outlay. There's too much going on.

And I said, is this going to cost me more or less than what I'm paying? What am I going to pay for the life insurance? This is when I'm going back to this $4,400 that's on [Bates number] 116 pointing to Short-Term Level Premium, because she was also explaining along with David Wickes, which was in meetings, that you can over fund a policy to where there is a minimum to sustain a policy and then you can over fund a policy if you needed to put money in for tax purposes. So I wanted to make sure what level am I talking about when I'm paying for a premium outlay for $750,000, because I knew I wasn't going to pay any more than what I was paying with Pac Life. And I wanted to know clarity. She verbally told me this $4,400.

(*Id.* at 164-65).

It is undisputed that Plaintiff gave Robinson a $400 check on August 7, 2012. (Doc. 43, Ex. 14). The parties also do not dispute that Plaintiff asked Robinson to change the payment mode to monthly after the meeting. (Doc. 40 at 94; Doc. 43 at 99-100). Robinson completed a second form authorizing Omaha to make monthly bank withdrawals to pay the premium and attached a copy of the $400 check showing the bank account information. (Doc. 43, Ex. 14 at 2). Robinson completed the same bank withdrawal authorization form as part of Plaintiff's application in December 2011, albeit for a different bank account. (Doc. 40, Ex. A at 10). On the form completed in August

2012, Robinson checked a box indicating "initial premium collected with the application." (Doc. 43, Ex. 14 at 2). However, Robinson testified that the delivery instructions required her to collect a $8,753.33 premium before delivering the policy. (*Id.* at 91, Ex. 11 at 1). Separately, Robinson called Omaha to inform them that Plaintiff wanted to change the payment mode to monthly. (*Id.* at 100).

The parties dispute much of the remaining events of August 7, 2012. Plaintiff testified that Robinson told him the monthly premium was $367, so Plaintiff rounded up and wrote a check for $400. (Doc. 40 at 8, 104, 109, 195). Robinson testified that she requested $8,753.33, but Plaintiff claimed he could only pay $400. (Doc. 43 at 97-99). Robinson alleges that Plaintiff made a racially insensitive comment in reference to Robinson's bi-racial children. (*Id.* at 101-02). Plaintiff adamantly denied making any such comment and indicated that Robinson mysteriously stopped returning his messages and "vanished" after August 7, 2012. (Doc. 40 at 105-08).

The Court cannot resolve this dispute on summary judgment, but there is no dispute that Robinson and Plaintiff had no interactions with each other after August 7, 2012. (*Id.*; Doc. 43 at 101-02; Doc. 44 at 92-94). After that, Wickes communicated exclusively with Plaintiff. (Doc. 40 at 105; Doc. 44 at 94). However, Wickes never told Plaintiff that Robinson no longer wished to deal with him. (Doc. 44 at 94). Robinson never asked Omaha to remove her as the insurance agent assigned to Plaintiff's policy, and Robinson received numerous communications from Omaha regarding Plaintiff's policy over the next four months.

On August 20, 2012, Omaha sent an email to Robinson indicating that there was a problem with Plaintiff's policy. (Doc. 43, Ex. 15). The email stated:

> This policy will be closed on due to the expiration of the delivery period.
> We did not receive the following information needed to place the policy in force.
> The initial premium
> PREMIUM LISTED IS 755.56 AND WE HAVE $400.00.

(*Id.*) Robinson and Wickes both testified that this email meant that $755.56 was the initial premium needed to put the Omaha policy in force. (Doc. 43 at 100-01; Doc. 44 at 97). Robinson forwarded this information to Wickes, but did not contact Plaintiff directly. (Doc. 43 at 102).

On August 21 and 22, 2012, Wickes and Plaintiff exchanged a series of text messages. (Doc. 44, Ex. 20). Wickes first said "Omaha is saying we need $355.56 to get policy issued and up to date we can then pay premiums from monies that were transferred from paclife [*sic*] this way it helps your budget." (*Id.* at 2). However, Wickes testified that his understanding was that Plaintiff needed to pay the full $8,753 premium before he could use the 1035 exchange money for premium payments. (Doc. 44 at 99). Robinson testified that Plaintiff could not use the $23,153.33 in 1035 exchange money to pay his initial premium. (Doc. 43 at 84-85). According to Robinson the total first year premium for the Omaha policy was $31,910.66, with $23,153.33 applied from the 1035 exchange money and the remaining $8,753.33 payable out-of-pocket from Plaintiff. (*Id.*)[5] Plaintiff responded to Wickes with, "Do that. Easier. Gave 400 to Heidi [Robinson] when I met

---

[5] This matches the $31,910 Annualized Premium Outlay for policy year 1 listed in the June 2012 illustration and the July 2012 revised illustration. (Doc. 40, Ex. H at 10; Doc. 43, Ex. 9 at 9).

her and they are supposed to mail to invoice monthly to me." (Doc. 44, Ex. 20 at 2). Wickes replied, "Omaha will need a check for the amount then we can going forward have it taken from that money ok." (*Id.*) Plaintiff met Wickes on August 22, 2012 at the UIG office in Columbus and gave Wickes a check for an amount not specified by the parties. (Doc. 44 at 101-02).

On August 30, 2012, Robinson faxed a policy illustration dated September 7, 2012 to Omaha. (Doc. 43 at 103-04, Ex. 16). The illustration was prepared because Plaintiff requested a change in the payment mode to monthly. (*Id.* at 103). The September 2012 illustration provided for a monthly Premium Outlay of $755.56, a Lifetime Level Premium of $8,943.48, a Short-Term Level Premium of $4,620.72, and an Annualized Premium Outlay of $32,627 for policy year 1 and $9,067 for all other years. (*Id.*, Ex. 16 at 9, 12). The annualized premiums listed in the September 2012 illustration were slightly higher than those in the July 2012 revised illustration because of the change from annual to monthly payment mode. (*Id.* at 51-52). The $755.56 monthly premium matched the amount indicated in the August 20, 2012 email from Omaha. (*Id.*, Ex. 15). The parties have not identified any evidence suggesting that Plaintiff received a copy of the September 2012 illustration.

On September 10, 2012, Robinson received an email from Omaha stating "we need an additional $1,270.96 to pay for the month of September on this case." (Doc. 43, Ex. 17). Robinson passed this information along to Wickes, but again she did not contact Plaintiff directly. (*Id.* at 104-05; Doc. 44 at 103-04). At their depositions, neither Robinson nor Wickes could explain why Omaha indicated that Plaintiff owed $1,270.96.

(Doc. 43 at 105; Doc. 44 at 109-10).  Wickes called Omaha sometime between September 10 and September 17, 2012.  (Doc. 44 at 104-05).  Wickes testified that he asked the Omaha representative if Omaha could issue a monthly statement to Plaintiff, which Omaha was unable to do.  (*Id.* at 105).  Plaintiff could pay by automatic monthly bank withdrawals, but Omaha would not issue monthly billing statements.  (*Id.*)  Wickes did not ask Omaha about the authorization for monthly bank withdrawals form completed by Robinson on August 7, 2012.  (Doc. 43, Ex. 14; Doc. 44 at 106).  Wickes also did not ask Omaha what the correct monthly premium was or why Omaha indicated that Plaintiff owed $1,270.96.  (Doc. 44 at 105, 110).  Further, Wickes could not explain why Omaha failed to make the monthly bank withdrawals from Plaintiff's account.  (*Id.* at 106).

On September 17, 2012, Wickes and Plaintiff exchanged another series of text messages:

> Wickes:  Van on the insurance.  Omaha is not able to send a monthly bill[.]
> Do u want to write check for premium or.  Have money sent to you
> and pay it from the transferred  Money[.] Either way let us know.
> Plaintiff:  Don't understand why they cannot.  Pacific life could.  Can they
> do quarterly?  I know the month is out of date and I was going to
> call this week due to not getting the statement.
> Wickes:  Yes they can do quarterly.  Your [*sic*] right it is dumb that they
> can't.
> Plaintiff:  Have them send me the quarterly then.
> Plaintiff:  We also need to work on who has the best 403b at Springfield and
> funnel $$ that way.
> Wickes:  Okay the premium due I [*sic*] 1,270 by sept. and we can look at the
> 403b list of choices
> Plaintiff:  Send to?? You?  Address??
> Wickes:  Will get the address.

(Doc. 44, Ex. 21 at 1-3).  Wickes testified that he did not know if he then told Omaha that Plaintiff wished to receive quarterly statements.  (Doc. 44 at 108-09).  Wickes also

testified that Omaha could not use the 1035 exchange money to pay the premium.  (*Id.* at 106-07).  When asked at his deposition what he meant by "have money sent to you and pay it from the transferred money," Wickes was unable to explain what he meant.  (*Id.*)

On September 21, 2012, Wickes and Plaintiff exchanged yet another series of text messages:

> Plaintiff:  How many months does 1270 cover?
> Wickes:  I believe 2.  Since it was rated up.
> Plaintiff:  Insurance is 367 and change.  For the cost of insurance.
> Something not right.  Gave Heidi 400 July/august. 400 x 3 is 1200 and 3 months
> Wickes:  That's true.  Let me check so we. Are straight.

(Doc. 44, Ex. 21 at 3-4).  Wickes did not respond until September 26, 2012.

On September 25, 2012, Omaha sent a second email to Robinson stating that Plaintiff needed to pay $1,270.96 for the month of September.  (Doc. 43, Ex. 17A).

Wickes got back to Plaintiff on September 26, 2012:

> Wickes:  755 per mth and the 1270 is what the policy needs to be funded correctly.  If we need to find another carrier that's less expensive we can.
> Plaintiff:  This is not what I was told
> Plaintiff:  755/month is more than pacific life.  We know this.  I will cancel this policy if need
> Plaintiff:  9060 is 755 a month.  I was only at 5400 with pacif [*sic*] life.  We reduced things to 4400 about.  I was told 367 and change was needed for the insurance cost to meet that obligation.  I paid Heidi 400.  We went over those tables at her place.  What is wrong, not being told, or got screwed on?
> Wickes:   Policy was rated up so we don't want to be more than PAC life We can fund as low as 367 per mth.  755 is the desired amount for the policy to work correctly.
> Wickes:   I can see what the options are at this point.
> Plaintiff:  I am aware of desired amount.  I will fun [*sic*] it to have the policy and put extra in when I can.  I am trying to pay any extra

> to banks after this bad business deal, and no winter and extreme
> drought we been through
>
> Plaintiff: I'll do 400/mo but not more for now trill things turn.
> Wickes:   I completely understand. I will see what we can do.

(Doc. 44, Ex. 21 at 4-7). When asked at his deposition what the text message meant by stating "we can fund as low as 367 per m[onth]. 755 is the desired amount for the policy to work correctly," Wickes testified that Plaintiff could pay $367 per month at some point in the future after he paid the initial premium. (Doc. 44 at 113-14). However, Wickes was unable to explain exactly when Plaintiff could have started paying that lower amount. (*Id.* at 114).

Plaintiff testified that he was concerned that he had not seen a bill and wanted Wickes to explain why he owed $1,270.96: "I had concern on the policy, because my concern was Omaha has $23,000, I have Heidi a check for $400, you're asking me for $1,200 more, and you cannot prove to me where you need $1,200." (Doc. 40 at 113-14). Plaintiff further elaborated:

> I wanted to know why we needed more money. I wanted to know how's
> come I'm not receiving any bill from Omaha? I want to know why Heidi
> [Robinson] is not communicating with me because she sold me this bill of
> goods. I gave permission to use the 1035 exchange money to pay anything
> to Omaha to keep the life insurance policy or anything that was deficient
> through verbal conversation because he didn't show me anything, and I
> wasn't mailed anything. So this belief of I needed more money, I needed to
> show--be seen why--why do you need money?

(*Id.* at 114-15). Wickes' text messages in September 2012 indicate that he was unable to provide Plaintiff with an answer at that time. At their depositions, neither Robinson nor Wickes could explain why Omaha needed $1,270.96. (Doc. 43 at 105; Doc. 44 at 109-10).

On October 2, 2012, Plaintiff sent another text message to Wickes:

Plaintiff: I gave Heidi a check for $400 august 7th. Where are we? I am questioning if I should have made a change. Wondering who is really winning . . . Thinking about undo [*sic*] things. Going to dig Pac Life out for review. Just want the right thing for long term sustainability. Willing to meet u guys.

(Doc. 44, Ex. 21 at 7). Plaintiff was concerned because he expected to pay monthly premiums of $367, but he had not received any correspondence or statements from Omaha and no withdrawals had been made from his bank account. (Doc. 40 at 94, 108-09, 117). On October 25, 2012, Plaintiff texted Wickes to say "I am concerned that I am not hearing anything from Omaha for what is owed." (Doc. 44, Ex. 21 at 8).

Wickes and Plaintiff met at Plaintiff's office in November 2012. (Doc. 40 at 118-23). Plaintiff testified that it was during that meeting when he fully realized that the Omaha policy was going to cost much more than $4,400 to fund. (*Id.*) However, Plaintiff testified that he could have afforded to pay $9,000 at that time if necessary. (*Id.* at 118-19).

On December 21, 2012, Omaha mailed a letter to Plaintiff stating that it had discontinued the processing of his application. (Doc. 43, Ex. 19). The letter stated: "The following requirements are still outstanding: initial premium of $4,293.20. . . . Our records indicate premium was submitted with the application in the amount of $995.72. Therefore a refund check for this amount is enclosed." (*Id.*) Robinson testified that she did not know where the $4,293.20 figure came from. (Doc. 43 at 107). Wickes also did not understand why Omaha listed $4,293.20 as the initial premium. (Doc. 44 at 123-24). It is undisputed that Plaintiff did not pay more than $995.72 in premiums to Omaha.

Plaintiff and Omaha signed a Settlement Agreement in December 2014. (Doc. 39,

Ex. L). The Settlement Agreement provides in relevant part:

> "UNITED OF OMAHA" shall mean UNITED OF OMAHA[6] and
> its predecessors, successors, assigns and past, present, and future parent
> corporations, subsidiaries, affiliates, holding companies, divisions,
> unincorporated business units, joint venturers, partners, insurers, officers,
> directors, shareholders, managers, employees, agents, servants,
> representatives, officials, attorneys, associates, and trustees.
> . . . .
> "Claims" shall mean all claims, including claims of bad faith,
> demands, actions, causes of action, debts, liabilities, damages, costs, fees,
> expenses, rights, duties, obligations, liens, petitions, suits, losses,
> controversies, executions, offsets and sums, of any kind or nature,
> contingent or actual, in law or in equity, known or unknown, suspected or
> unsuspected, or of whatever type or nature, including but not limited to
> those claims asserted or that could have been asserted against UNITED OF
> OMAHA and/or its affiliates.
> . . . .
> Except as to such rights or claims as may be created by this
> Agreement, Plaintiff hereby fully and forever releases and discharges
> UNITED OF OMAHA from any and all claims, including claims of bad
> faith, demands, defenses, liens, agreements, contracts, covenants, actions,
> suits, causes of action, obligations, controversies, judgments, orders, and
> liabilities of whatever kind and nature, in law, equity or otherwise, whether
> now known or unknown, suspected or unsuspected, which have existed or
> may have existed, or which do exist or which hereinafter can, shall or may
> exist, by reason of any act, omission, event, contract, or transaction by or
> with United of Omaha occurring prior to the date of this Agreement relating
> in any manner to the Claims, as well as based on any matters that were, or
> have been, or could in any way have been, alleged in the Litigation or
> otherwise against United of Omaha in connection with the Claims.
> . . . .
> United of Omaha agrees that it shall reasonably cooperate with
> Plaintiff and UIG with regard to the production of United of Omaha
> documents to the extent necessary for the litigation between Plaintiff and
> UIG.

---

[6] The preamble to the Settlement Agreement parenthically defined "UNITED OF OMAHA" as
"United of Omaha Life Insurance Company." (*Id.*)

(Doc. 39, Ex. L at ¶¶ 1(b), 1(f), 6, 23).

## IV.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.

## V.   ANALYSIS

UIG moves for judgment as a matter of law on Plaintiff's four remaining tort claims.  UIG argues that Plaintiff (1) cannot hold UIG vicariously liable for the conduct of Robinson and Wickes, (2) cannot show the existence of a fiduciary relationship, (3) cannot prove his negligence claim without expert testimony, and (4) cannot show justifiable reliance for his claims for negligent misrepresentation and fraudulent inducement claims.

## A.     Vicarious Liability

Plaintiff's claims are premised on holding UIG vicariously liable for the alleged tortious conduct of Robinson and Wickes. "The respondeat superior doctrine makes an employer or principal vicariously liable for the torts of its employees or agents." *Auer v. Paliath*, 17 N.E.3d 561, 564 (Ohio 2014). However, an employer or principal is only vicariously liable for torts committed within the scope of employment or scope of agency. *Id.* at 565-66. A "scope-of-agency determination necessarily turns upon a multitude of considerations and fact-specific inquiries" and is typically reserved for the finder of fact. *Id.* at 566. Relevant factors include whether the tortious acts were "an ordinary and natural incident or attribute of the service to be rendered, or a natural, direct, and logical result of it." *Id.* If the claim involves an intentional tort, "the behavior giving rise to the tort must be calculated to facilitate or promote the business for which the servant was employed" and the "agent's motivations and the self-interested nature of her actions are therefore necessary considerations in a scope-of-agency inquiry." *Id.*

To establish vicarious liability for UIG, Plaintiff must prove that Robinson and Wickes acted as UIG's employees or principals and remain subject to primary liability for their allegedly tortious conduct:

> An agent who committed the tort is primarily liable for its actions, while the principal is merely secondarily liable. The liability for the tortious conduct flows through the agent by virtue of the agency relationship to the principal. If there is no liability assigned to the agent, it logically follows that there can be no liability imposed upon the principal for the agent's actions.

*Comer v. Risko*, 833 N.E.2d 712, 716-17 (Ohio 2005) (citations omitted). Further, "an employer is generally not liable for the negligent acts of an independent contractor." *Pusey v. Bator*, 762 N.E.2d 968, 972 (Ohio 2002).

Ohio law provides agency principles specific to the insurance context. In *Damon's Missouri, Inc. v. Davis*, 590 N.E.2d 254 (Ohio 1992), the Supreme Court of Ohio described the distinction between an "insurance agent" and an "insurance broker"[7]:

> [E]xclusivity of control is at the heart of the distinction between an insurance agent and an insurance broker. While both types of agents solicit insurance business from the public, an insurance agent has a fixed, permanent and exclusive relationship with the insurance company that the agent represents. An insurance broker, on the other hand, is not restricted to representing one company. Instead, he acts as a middleman between his customer and the potential insurer, and once having received an order the insurance broker places the insurance with the company selected by the insured or, in the absence of any selection by the insured, with the company selected by such broker.

*Davis*, 590 N.E.2d at 259. The parties agree that Robinson and Wickes are properly classified as insurance brokers or independent insurance agents because each sold insurance on behalf of multiple insurance carriers, including Omaha. (Doc. 39, Ex. D; Doc. 43 at 9; Doc. 44 at 15).

---

[7] "Under Ohio law, an insurance broker is referred to as an 'independent insurance agent.'" *Davis*, 590 N.E.2d at 259. The relevant statute provides:

> "[I]ndependent insurance agent" means an insurance agent who is neither employed nor controlled solely by an insurer, whose agency contract with an insurer provides that upon termination of the contract, the ownership of the property rights of all expiration information vests in the agent or the agent's heirs or assigns, and whose agency contract with an insurer permits the agent to represent concurrently other insurers of the agent's choice.
> Ohio Rev. Code § 3905.49(A).

An insurance broker may act as the agent for the prospective insured or the insurance carrier depending on the specific act at issue. In *Davis*, the court addressed when an insurance broker begins to act as an agent for a particular insurance carrier for purposes of vicarious liability under Ohio Rev. Code § 3929.27, the statutory provision applicable to property and casualty insurance policies.[8] Here, the Court applies Ohio Rev. Code § 3911.22, the statute applicable to life insurance policies.[9] That statute provides: "Any person who solicits an application for insurance upon the life of another person shall, in any controversy between the insured or his beneficiary and the company issuing a policy upon such application, be considered the agent of the company and not the agent of the insured." Ohio Rev. Code § 3911.22. These statutes are substantially similar.

The court in *Davis* addressed when an insurance broker acts as a soliciting agent and may subject the insurance carrier to vicarious liability, *i.e.*, the point when the broker is no longer "performing activities particular to his role as an insurance broker" and begins "acting in the capacity of an agent for the insurance company which thereafter issues the policy." *Davis*, 590 N.E.2d at 258, 260. The court established the following standard for determining when an insurance company may be held vicariously liable for the actions of an insurance broker:

---

[8] "A person who solicits insurance and procures the application therefor shall be considered as the agent of the party, company, or association thereafter issuing a policy upon such application or a renewal thereof, despite any contrary provisions in the application or policy." Ohio Rev. Code § 3929.27.

[9] Yet another statutory provision applies to solicitation of sickness and accident insurance policies. Ohio Rev. Code § 3923.141.

> [W]hile an insurance broker (or independent insurance agent) is investigating the insurance requirements of his or her customer, the potential insured, such broker is not an agent for a particular insurer. However, an insurance broker becomes an agent for a particular insurer when: (1) the broker notifies its customer that he or she intends to place the customer's insurance coverage with a particular insurer; or (2) the broker accepts an application for insurance on behalf of the customer.

*Id.* at 260.

It is undisputed that Robinson and Wickes acted as agents of Omaha for some portion of the events at issue in this action. The Court concludes below that Plaintiff released Robinson and Wickes from all liability in their capacities as agents of Omaha by way of the Settlement Agreement. However, there are a number of factual disputes and legal issues not addressed by the parties that prevent the Court from conclusively determining that the Settlement Agreement released Robinson and Wickes from all primary liability, *i.e.*, the extent to which Robinson and Wickes acted only as agents or employees of UIG but not of Omaha.

### 1. Settlement Agreement

UIG argues that the Settlement Agreement between Plaintiff and Omaha released Robinson and Wickes from all liability, which in turn leaves no basis for Plaintiff to hold UIG vicariously liable. "A release of a cause of action for damages is ordinarily an absolute bar to a later action on any claim encompassed within the release." *Haller v. Borror Corp.*, 552 N.E.2d 207, 210 (Ohio 1990). Further, Ohio applies the "common-law rule that the release of a party primarily liable also releases a party secondarily liable, although the converse is not necessarily true." *Niemann v. Post Indus., Inc.*, 588 N.E.2d

301, 303 (Ohio App. 1991).[10]  The issue presented here is what claims are encompassed within the Settlement Agreement and whether the release of Omaha as the secondarily liable party also releases Robinson and Wickes from all primary liability.

In the Settlement Agreement, Plaintiff agreed, *inter alia*, that he "fully and forever releases and discharges UNITED OF OMAHA from any and all claims, . . . actions, suits, causes of action, obligations, controversies, . . . and liabilities of whatever kind and nature . . . by reason of any act, omission, event, contract, or transaction by or with United of Omaha occurring prior to the date of this Agreement relating in any manner to the Claims, as well as based on any matters that were, or have been, or could in any way have been, alleged in the Litigation or otherwise against United of Omaha in connection with the Claims."  (Doc. 39, Ex. L at ¶ 6).  The Settlement Agreement defined "UNITED OF OMAHA" to include its employees, agents, and associates.  (*Id.* at ¶ 1(b)).  Finally, the Settlement Agreement defined the term "Claims" as "all claims . . . of whatever type or nature, including but not limited to those claims asserted or that could have been asserted against UNITED OF OMAHA and/or its affiliates."  (*Id.* at ¶ 1(f)).

UIG argues that the broad definitions of "UNITED OF OMAHA" and "Claims" in paragraphs 1(b) and 1(f), combined with the wide-reaching language of release in paragraph 6, results in the Settlement Agreement also releasing Robinson and Wickes from all primary liability, not just those claims that could have resulted in vicarious

---

[10] *See also Metz v. Unizan Bank*, 649 F.3d 492, 501 (6th Cir. 2011) ("Under Ohio law, a plaintiff's 'settlement with and release of the servant will exonerate the master.'" (quoting *Losito v. Kruse*, 24 N.E.2d 705, 707 (Ohio 1940))).

liability for Omaha.  Accordingly, UIG argues that there is no tortious conduct for which to hold UIG vicariously liable.

In *Pakulski v. Garber*, 452 N.E.2d 1300 (Ohio 1983), the appellant signed a release discharging liability against several named persons and "their successors, assigns, officers, directors, agents, [and] employees."  *Id.* at 1302.  When the appellant later brought suit against the persons named in the release as well as their attorney and law firm, the court held that the release barred suit against all:

> Appellee Shumaker, Loop & Kendrick and appellee McCracken were "agents" and "employees" of the named releasees to whom specific reference as "agents" and "employees" was made in the releases. Appellant, an attorney with knowledge of the legal implication of releases, reviewed and revised the releases before signing them.  Such releases evince an intention of all parties to release McCracken and Shumaker, Loop & Kendrick as well as the appellees specifically named in the releases.

*Id.* at 1303.

In *Jaeger v. LaCroix*, No. 68944, 1996 WL 11321 (Ohio App. Jan. 11, 1996), the appellant released a corporation and its "directors, officers, employees, [and] agents" from liability.  The appellant later brought suit against three members of the corporation's board of directors and argued that the release did not bar his claims because he proceeded against the board members in their individual capacities.  *Id.* at 2.  However, the court held that the factual allegations in the claims related only to actions undertaken on behalf of the corporation and therefore were released in the settlement agreement:

> The only actions of the Superior defendants appellant brought up in his complaint related to activities by the defendants in their capacity as officers and directors of Superior Savings, not as individuals.  This is squarely within the language of the release and appellant gave up any such claims when he signed the release.

*Id.* at 3.

Here, the Settlement Agreement defined "UNITED OF OMAHA" to include its "agents" and "employees." (Doc. 39, Ex. L at ¶ 1(b)). As in *Pukulski*, the Settlement Agreement was negotiated in the context of a civil action that sought to hold Omaha vicariously liable for the actions of Robinson and Wickes as Omaha's agents. Accordingly, the Settlement Agreement released Robinson and Wickes from liability in their capacities as agents of Omaha.

UIG argues that the Settlement Agreement also released Robinson and Wickes from all claims, not just those that could have led to vicarious liability for Omaha. Therefore, UIG maintains, there is no basis for Plaintiff to hold UIG vicariously liable.[11] Plaintiff argues that the language of the Settlement Agreement was specific and qualified such that it is limited to the claims against Robinson and Wickes as agents of Omaha.

UIG relies on *Wilson v. Durrani*, No. C-130234, 2014 WL 1337583 (Ohio App. Mar. 19, 2014), and *Roy v. Durrani*, No. C-140181, 2015 WL 82529 (Ohio App. Jan. 7, 2015), for the proposition that the Settlement Agreement also extinguished UIG's vicarious liability. The plaintiffs in *Wilson* and *Roy* both had the same surgical procedure performed by a doctor while he was employed by a hospital. The doctor later ended his employment at the hospital and opened his own medical practice called CAST, where the doctor treated the plaintiffs at least once. In separate actions, the plaintiffs brought

---

[11] UIG repeatedly argued that it was not an agent of Omaha and was not directly released by the Settlement Agreement. (Doc. 55).

claims against the doctor, hospital, and the medical practice. The plaintiffs signed similar settlement agreements that defined the hospital to includes its "agents" and "employees," and released the hospital from liability.

In *Wilson*, the plaintiff received treatment from the doctor at his medical practice for nine months. *Wilson*, 2014 WL 1337583, at *1. The plaintiff asserted claims for negligence, battery, and fraud against the doctor, negligent supervision against the hospital, and negligence and vicarious liability against the medical practice. *Id.* The court held that "the plain language of the settlement agreement released Wilson's claims against Dr. Durrani and therefore, his vicarious-liability claim against CAST." *Id.* at 4.[12]

---

[12] The settlement agreement defined "CCHMC" as the hospital and its agents and employees, and further provided:

> PLAINTIFF hereby fully and completely settles, releases, remises, quitclaims, acquits, forever discharges and holds CCHMC harmless from any and all past, present and future claims, and potential claims, demands, damages, actions, liens (including but not limited to those asserted, either now or at any time in the future, by any private insurance carrier) . . . *related to the care and treatment of PLAINTIFF (hereafter "the Incident") and the facts as set out in the case captioned . . . . (hereafter "Action").*
> . . . .
> PLAINTIFF understands and agrees that the settlement sum being paid on behalf of CCHMC, as set forth above, is fair and equitable under all circumstances as consideration for the full and final settlement of any and all past, present or future claims, rights, causes of action, including, but not limited to, wrongful death and survivorship and/or demands for damages against CCHMC *arising out of the Incident and/or which are in any way related to the Action.*
> . . . .
> PLAINTIFF understands and agrees that any and all claims, rights, causes of action, and or demands that he has or could have had against CCHMC related to the Incident, whether known or unknown, are merged herein and that this AGREEMENT is intended as a general release of any and all existing and potential claims and rights that have been or may at any time hereafter be asserted against CCHMC that *are the result of or in any way related to the injuries of PLAINTIFF.*

However, the release did not encompass the negligence claim against the medical practice. *Id.* at 5. The court affirmed the grant of summary judgment for the medical practice on the negligence claim without any substantive analysis. *Id.*

In *Roy*, the plaintiff filed a "medical-malpractice complaint" against the same doctor, hospital, and medical practice. *Roy*, 2015 WL 82529, at *1. The exact claims against each party are not provided, although the doctor treated the plaintiff one time at his new medical practice. *Id.* The court held that "[b]ased on the clear and unambiguous language of the settlement agreement in this case, and relying on the precedent set in *Wilson*, we determine that the settlement agreement released the Roys' claims against Dr. Durrani, who was an employee of CHMC at the time that he performed surgery on Joshua." *Id.* at 3.[13] However, the court also held that "the Roys' claims against CAST

---

. . . .
And it is therefore specifically agreed that this AGREEMENT shall be a complete bar to all claims or suits for injuries or damages by PLAINTIFF against CCHMC, of whatsoever nature or for any reason, *arising out of or related to the Incident.* PLAINTIFF expressly waives and assumes the risk that there may be additional claims, facts, evidence, injuries, and/or damages which they do not know at the present time.

*Id.* at 3-4 (emphasis in original).

[13] The settlement agreement defined "DEFENDANTS" as the hospital, including its agents and employees. The language of release provided in relevant part:

PLAINTIFFS hereby fully and completely settle, release, remise, quitclaim, acquit, forever discharge and hold DEFENDANTS harmless from any and all past, present and future claims . . . incurred or to be incurred, related to any and all matters arising out of or in any way connected to the facts as set out in the case captioned . . . . PLAINTIFFS hereby fully and completely covenant that they will not bring, commence, prosecute, or cause or permit to be brought, commenced, or prosecuted, either directly or indirectly, any suit or action against DEFENDANTS related to DEFENDANTS' care and treatment of JOSHUA ROY before the section of this release. *Id.* at 2.

were not similarly released by the settlement agreement, but we nonetheless hold that the trial court's grant of summary judgment to CAST was proper." *Id.* The court did not provide any substantive analysis with respect to the claims not released by the settlement agreement, nor did it identify the exact nature of those claims or the conduct on which they were based. *Id.*

The Court finds that the opinions in *Roy* and *Wilson* provide little binding or persuasive precedent to the facts presented here.

First, the opinions set forth almost no factual information or legal analysis regarding the claims against the medical practice. UIG analogizes itself to the medical practice and argues that the Court should similarly hold that the Settlement Agreement releases UIG from all liability. However, the opinions in *Roy* and *Wilson* provide no basis to determine that Plaintiff's claims against UIG are similar to the claims that were asserted against the medical practice. For example, in *Roy* the court held that the settlement agreement did not release the "claims" brought against the medical practice, but there is no indication what those claims were or what factual allegations they were premised upon. *Roy*, 2015 WL 82529, at *3. In *Wilson*, the court held that the settlement agreement encompassed the vicarious liability claims asserted against the medical practice, but not the negligence claims, without indicating the basis for either claim. *Wilson*, 2014 WL 1337583, at *4-5.

Second, the settlement agreements in *Roy* and *Wilson* were broader than the Settlement Agreement here and made repeated reference to the defined term in the language granting the release. Paragraph 6 of the Settlement Agreement uses one time

"UNITED OF OMAHA," which is defined to include its agents and employees, and uses "United of Omaha" two other times in the paragraph. (Doc. 39, Ex. L at ¶ 6). The settlement agreements in *Roy* and *Wilson* repeatedly used the defined terms of CCHMC and DEFENDANTS in the language of release. Interpreting the Settlement Agreement as written, the parties' choice to twice use the non-defined phrase of "United of Omaha" instead of the defined term of "UNITED OF OMAHA" may indicate an intent to differentiate between the two.

Third, *Wilson* and *Roy* excluded parole evidence that purported to show the parties' intent not to release the doctor or his medical practice. Here, the Settlement Agreement itself reflects the parties' intent that Plaintiff's claims against UIG would not be extinguished: "United of Omaha agrees that it shall reasonably cooperate with Plaintiff and UIG with regard to the production of United of Omaha documents to the extent necessary for the litigation between Plaintiff and UIG." (Doc. 39, Ex. L at ¶ 23).[14] Finally, as is discussed in greater depth below, standards of pleading and vicarious liability in medical malpractice claims are not necessarily applicable to the standard negligence claims at issue here.

Accordingly, the Court concludes that the Settlement Agreement released Robinson and Wickes only in their capacities as agents of Omaha. Plaintiff may pursue his claims against UIG to the extent they rely on the conduct of Robinson and Wickes

---

[14] *See also* (*Id.* at ¶ C) ("Whereas Plaintiff and UNITED OF OMAHA desire to terminate the Litigation as to them and resolve all disputes between them, and UNITED OF OMAHA and UIG desire to terminate the Litigation as to them and resolve all disputes between them.").

that was performed outside the scope of their agency with Omaha. *See Jaeger*, 1996 WL 11321, at *3.

### 2. Wuerth *doctrine*

Next, UIG contends that under the Supreme Court of Ohio's holding in *Nat'l Union Fire Ins. Co. of Pittsburgh v. Wuerth*, 913 N.E.2d 939 (Ohio 2009), Plaintiff is barred from asserting claims against UIG based on vicarious liability because he did not join Robinson and Wickes in this action. UIG maintains that *Wuerth* established the broad principle that if a person looks to an agent for services, he must sue the agent in order to also sue the principal. However, UIG's position is not supported by plain reading of *Wuerth* or any case applying its holding.

In *Wuerth*, the court answered two certified questions: "one, whether a law firm may be *directly* liable for legal malpractice—i.e., whether a law firm, as an entity, can commit legal malpractice—and two, whether a law firm may be held *vicariously* liable for malpractice when none of its principals or employees are liable for malpractice or have been named as defendants." *Wuerth*, 913 N.E.2d at 942. The court answered the first question by applying the principles of medical malpractice claims: "our precedent concerning medical malpractice is instructive, and in the medical context, we have recognized that because only individuals practice medicine, only individuals can commit medical malpractice." *Id.* Next, the court held that "[a]s with the practice of medicine, it is apparent that only individuals may practice law in Ohio." *Id.* at 943. Accordingly, the court held that a law firm cannot be held directly liable for legal malpractice because only an individual can engage in the practice of law. *Id.* Second, the vicarious liability claim

38

against the law firm failed because the statute of limitations had expired as to the only individual attorney the plaintiffs could hold primarily liable. *Id.* at 944.

The only cases cited by UIG that have affirmatively applied the holding of *Wuerth* involved claims for dental malpractice against a dental office when the statute of limitations barred claims against the individual dentist. *Whitcomb v. Allcare Dental & Dentures*, No. 97141, 2012 WL 1755861, at *2 (Ohio App. May 17, 2012) ("[B]ecause Whitcomb's claim against Chaudry is time-barred, Allcare cannot be held vicariously liable for the dental malpractice claims."); *Hignite v. Glick, Layman & Assoc., Inc.*, No. 95782, 2011 WL 1327433, at *1 (Ohio App. Apr. 7, 2011) (affirming the trial court's holding that a "dental practice cannot be liable for dental malpractice under a theory of respondeat superior when the statute of limitations has expired against the individual dentists").

Despite conceding that courts have uniformly declined to extend the holding of *Wuerth* beyond claims for medical, dental, and legal malpractice, UIG contends that these decisions evince a rule that the dispositive issue is whether the plaintiff looked primarily to the principal or agent for services. UIG argues that the decision in *Scott Elliot Smith, LPA v. Travelers Cas. Ins. Co. of Am.*, No. 2:12-cv-65, 2012 WL 1758398 (S.D. Ohio May 16, 2012), confirms that the proper inquiry is to whom the plaintiff looked to for services. However, that case observed that courts "have interpreted *Wuerth* narrowly and rejected contentions that, outside of the malpractice setting, agents or employees must be

named as defendants for claims of vicarious liability to succeed." *Id.* at 5.[15] Further,

*Wuerth* recognized and applied the general rule that "a party injured by an agent may sue

the principal, the agent, or both." *Wuerth*, 913 N.E.2d at 944. The law firm in *Wuerth*

could not be held vicariously liable because the statute of limitations had expired against

the individual lawyer before the initial complaint was filed, not because the lawyer was

not joined in the action. *Id.* at 595-96. Accordingly, the Court does not accept UIG's

contention that whom the plaintiff looked to for services is a relevant inquiry in the

vicarious liability analysis.

### 3. Independent contractors

UIG also argues that Robinson and Wickes were independent contractors.

Specifically, UIG argues that its contracts with Robinson and Wickes referred to them as

independent insurance agents and Robinson and Wickes used that term to describe

themselves. (Doc. 39, Ex. D1; Doc. 43 at 8-9; Doc. 44 at 16). UIG also contends that

Robinson and Wickes were independent contractors because they contracted with

multiple insurance carriers, were not provided with office space or company computers,

and because the delivery of the Omaha policy occurred at Robinson's house. In his

response, Plaintiff identified a number of facts indicative of an employment relationship

and argued that a reasonable jury could conclude that Robinson and Wickes were

employees of UIG. UIG does not address these facts or the argument in its reply brief.

---

[15] *See also Stanley v. Cmty. Hosp.*, No. 2010 CA 53, 2011 WL 941527, at *4 (Ohio App. Mar. 18, 2011) ("The holding in *Wuerth* must be given a narrow application.").

Further, Plaintiff's record citations reveal that many of the factual contentions that UIG relies upon mischaracterize the relevant deposition testimony. On a motion for summary judgment, the Court must construe the facts and all reasonable inferences in the light most favorable to Plaintiff.

"The chief test in determining whether one is an employee or an independent contractor is the right to control the manner or means of performing the work." *Pusey*, 762 N.E.2d at 972. Other "factors to be considered include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." *Bostic v. Connor*, 524 N.E.2d 881, 884 (Ohio 1988) (citing Restatement (Second) of Agency § 220 (1956)).[16] Additionally, "as a

---

[16] The Third Restatement of Agency lists the following factual indicia as relevant to whether an agent is an employee:

> the extent of control that the agent and the principal have agreed the principal may exercise over details of the work; whether the agent is engaged in a distinct occupation or business; whether the type of work done by the agent is customarily done under a principal's direction or without supervision; the skill required in the agent's occupation; whether the agent or the principal supplies the tools and other instrumentalities required for the work and the place in which to perform it; the length of time during which the agent is engaged by a principal; whether the agent is paid by the job or by the time worked; whether the agent's work is part of the principal's regular business; whether the principal and the agent believe that they are creating an employment relationship; and whether the principal is or is not in business.

Restatement (Third) of Agency § 7.07 cmt. f (2006
.
The Supreme Court of Ohio has cited the Third Restatement of Agency with approval in a number of recent opinions, including section 7.07. *See, e.g.*, *Auer*, 17 N.E.3d at 566.

practical matter, every contract for work reserves to the employer a certain degree of control to enable him to ensure that the contract is performed according to specifications." *State ex rel. Nese v. State Teachers Ret. Bd. of Ohio*, 991 N.E.2d 218, 226 (Ohio 2013).

Plaintiff has created a material factual dispute as to whether Wickes and Robinson were employees of UIG. Wickes testified that he has the title of district sales manager and reports to UIG's national sales director at the home office in Michigan. (Doc. 44 at 11, 21). Wickes' responsibilities include recruiting, interviewing, and training new hires, supervising all UIG agents in Ohio, and selling insurance products. (*Id.* at 11-14). Wickes has not been associated with another insurance broker since he joined UIG in 2009. (*Id.* at 15). Robinson received training from UIG through Wickes and she is paid directly by UIG, not by the individual insurance companies. (Doc. 43 at 14-19).

UIG provides most sales leads to its agents and also provides sales support and marketing materials. (Doc. 43 at 20, 23-24; Doc. 44 at 20-21). UIG provided office space to Robinson and Wickes from 2009 to 2013. (Doc. 44 at 18-20). During that time, UIG provided a full-time administrative assistant and office supplies. (*Id.*) Plaintiff met with Robinson and Wickes at the Columbus office on several occasions. (Doc. 40 at 75, 81, 185-86; Doc. 43 at 76).

UIG does not address these facts in its reply, nor does it otherwise argue that Robinson and Wickes were not its employees. The Court does not hold that all insurance brokers are employees of their respective insurance sales agency. Rather, UIG has not

satisfied its burden on summary judgment to establish that Robinson and Wickes were not its employees.

**B.      Breach of Fiduciary Duty**

"A claim of breach of a fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care." *Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1988). A fiduciary relationship is a relationship "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996). A fiduciary relationship "may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed." *Stone v. Davis*, 419 N.E.2d 1094, 1098 (Ohio 1981). Accordingly, "a fiduciary relationship cannot be unilateral; it must be mutual." *Tornado Techs., Inc. v. Quality Control Inspection, Inc.*, 977 N.E.2d 122, 126 (Ohio App. 2012).

"Ordinarily, the relationship between an insured and the agent that sells the insurance is, without proof of more, an ordinary business relationship, not a fiduciary one." *Slovak v. Adams,* 753 N.E.2d 910, 916 (Ohio App. 2001). Further, "an insured's reliance on his insurance agent is not sufficient, by itself, to establish a fiduciary relationship." *Nichols v. Schwendeman,* No. 07AP-433, 2007 WL 4305718, at *3 (Ohio App. Dec. 11, 2007).

Plaintiff argues that his relationship with Robinson and Wickes is sufficient for a reasonable jury to find the "more" necessary for a fiduciary relationship. Plaintiff met with Robinson and Wickes about every two weeks at the UIG office in Columbus. (Doc.

40 at 80-81).  Plaintiff brought his entire insurance and investment portfolio to those meetings.  (*Id.* at 82).  Wickes reviewed Plaintiff's retirement plan offered through his employer and his Roth IRA.  (Doc. 44 at 41-42).  Wickes discussed how fixed annuities could offer more guarantees than Plaintiff's Roth IRA and reviewed how they could fit into his overall retirement plan.  (*Id.* at 41-42, 50).  Wickes researched annuities after meeting with Plaintiff.  (*Id.* at 53).  Wickes also researched an individual health insurance policy for an employee of Plaintiff's business.  (*Id.* at 53-54).

Robinson and Wickes prepared a policy illustration for Plaintiff on his own life insurance policy.  (Doc. 43, Ex. 5).  However, Plaintiff testified that they advised him not to purchase this policy because it was not an improvement over his current policy.  (Doc. 40 at 68-69).

 Ohio courts have found that a fiduciary relationship does not exist when, for example, the evidence shows "nothing more than an ordinary business relationship between insurance agent and client." *Tornado Techs.*, 977 N.E.2d at 127.[17]  However, UIG does not offer any evidence or argument in response to the facts presented by Plaintiff.  Nor did UIG argue that Robinson and Wickes lacked the requisite mutuality of understanding necessary to create a fiduciary relationship.  Rather, UIG argues that Plaintiff's breach of fiduciary duty claim fails because Plaintiff breached his "corresponding duty" to read and examine the policy.  (Doc. 55 at 16-18).

---

[17] *See also Horak v. Nationwide Ins. Co.*, No. CA 23327, 2007 WL 2119861, at *5 (Ohio App. July 25, 2007) (holding that "there is no evidence that appellants, both of whom are educated people, placed any more reliance on appellee Crawford than is usually placed on an insurance agent by a client").

"The relationship between an insurance salesman and his customer may take on fiduciary dimensions when reliance is reasonably reposed in the salesman by the customer." *Roberts v. State Farm Mut. Auto. Ins. Co.*, No. 43388, 1982 WL 2284, at *4 (Ohio App. Jan. 7, 1982). Plaintiff has offered facts from which a reasonable jury could find that a fiduciary relationship existed and that Plaintiff reasonably relied on Robinson and Wickes for guidance beyond the scope of an ordinary business relationship with an insurance broker. On summary judgment, UIG bears the burden of showing the absence of genuine disputes over facts which, under the governing law, might affect the outcome of the claim. UIG has not satisfied this burden with respect to Plaintiff's breach of fiduciary duty claim.

## C. Negligence

A negligence claim requires proof of the existence of a duty, a breach of that duty and injury resulting proximately therefrom. *Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989). "An insurance sales agency owes its customer a duty to exercise good faith and reasonable diligence in undertaking to acquire the needed insurance coverage." *Davis*, 590 N.E.2d at 258 n.2. Further, "an insurance agency has a duty to exercise good faith and reasonable diligence in obtaining insurance that its customer requests." *Tornado Techs.*, 977 N.E.2d at 125. If an insurance agent's negligence results in coverage less than that desired by an insured, the agent will be liable for the amount the insured would have received had the correct coverage been in place. *Carpenter v. Scherer Mountain Ins. Agency*, 733 N.E.2d 1196, 1203 (Ohio App. 1999).

Plaintiff argues that Robinson and Wickes failed to exercise reasonable care in communicating with Plaintiff and Omaha, and in acquiring the insurance coverage that Plaintiff requested. Plaintiff testified that he asked Robinson and Wickes to secure a replacement to his Pac Life policy that provided the same $750,000 death benefit for less than $5,400. (Doc. 40 at 12-13, 63-64, 88, 97). On the Omaha application, Plaintiff specifically wrote that he sought to replace his existing policy because it was "too expensive." (*Id.*, Ex. A at 17). Robinson and Wickes testified that Plaintiff asked them if he "could do better" than the Pac Life policy, which both interpreted to mean that Plaintiff sought a whole life insurance policy with guaranteed interest instead of a variable rate insurance. (Doc. 43 at 34-40; Doc. 44 at 32-41). Robinson testified that Plaintiff did not specify what he meant by "do better" nor did Plaintiff say that the Pac Life policy was unsafe. (Doc. 43 at 35-40). Wickes testified that he was "not sure" what Plaintiff meant by "do better" and also testified that Plaintiff never indicated that he held the Pac Life policy for a reason other than the death benefit. (Doc. 44 at 34, 40-41).

The policy illustrations provide that the "Premium Outlay for policy year 1 reflects either (a) the annualized requested premium, (b) the minimum premium required to issue the policy . . . , whichever is applicable." (Doc. 43, Ex. 9 at 3). The Omaha policy defined "Planned Premium" as "the premium payments you plan to make under this policy. The initial premium you plan to make is shown as the 'Planned Premium' in the POLICY DATA section of the Data Pages." (Doc. 40, Ex. K at 3). Additionally, the Omaha policy provided that "'Flexible' premium means that, within certain limits, the amount and timing of the premiums you pay may vary during the term of this policy."

(*Id.*)  Robinson and Wickes testified that the Premium Outlay provided in the illustrations reflected the "annualized requested premium."  (Doc. 43 at 83; Doc. 44 at 78).

From the plain language of the Omaha policy and illustrations, and the conflicting deposition testimony, a reasonable jury could conclude that Robinson and Wickes failed to exercise reasonable care in obtaining the coverage Plaintiff requested.  The plain meaning of words such as "planned" and "requested" suggest aspirational or self-selected amounts, not mandatory.  Omaha ultimately discontinued the processing of Plaintiff's application based on his failure to pay the "initial premium of $4,293.20."  (Doc. 43, Ex. 19).  Despite the numerous policy illustrations in the record, UIG cannot explain why Omaha indicated this was the initial premium.  UIG also cannot explain why Omaha requested $1,270.96 in September 2012.  Plaintiff asked Wickes to explain why this amount was due, which Wickes was unable to do at the time and at his deposition.  A reasonable jury could conclude that Plaintiff reasonably decided not to pay this amount when it was not listed in his insurance policy and his insurance agent was unable to provide an explanation.  These are just some of the many factual disputes that preclude summary judgment for UIG as to whether Robinson and Wickes exercised good faith and reasonable diligence in obtaining the insurance Plaintiff requested.

A reasonable jury could also find that Robinson and Wickes failed to exercise reasonable care in communicating with Plaintiff.  It is undisputed that Robinson ceased communicating with Plaintiff after August 7, 2012, yet Omaha continued to send Robinson important notices about Plaintiff's premium payments.  Only the finder of fact

can determine why Robinson stopped speaking with Plaintiff and whether it was reasonable for Plaintiff to expect her to return his messages.

Aside from the merits of Plaintiff's negligence claim, UIG argues that Plaintiff will be unable to prove the standard of care of an insurance broker because he failed to identify an expert witness and because any damages resulted from Plaintiff's failure to read the policy.

### 1. Expert Testimony

UIG cites a line of cases holding that it is "necessary to establish the standard of care of an insurance agent through expert testimony." *Associated Visual Commc'ns v. Erie Ins. Grp.*, No. 2006 CA 00092, 2007 WL 520316, at *9 (Ohio App. Feb. 20, 2007).[18] Plaintiff's case law indicates that "[t]here is no blanket rule requiring expert testimony against an insurance broker in all cases." *Burlington Ins. Co. v. Artisan Mech., Inc.*, 936 N.E.2d 114, 118 (Ohio App. 2010). These latter line of cases indicate that "[w]hen it is a matter of common knowledge that a certain act may produce injury, expert testimony is not required." *LeForge v. Nationwide Mut. Fire Ins. Co.*, 612 N.E.2d 1318 (Ohio App. 1992).[19]

---

[18] *See also Lawson v. Ohio Cas. Ins. Co.*, No. 65336, 1994 WL 245846, at *3 (Ohio App. June 2, 1994) ("Expert testimony is appropriate to establish the standard of care of an insurance agent.").

[19] *See also Am. Int'l Recovery v. Allstate Ins. Co.*, No. 2009-P-0008, 2009 WL 4758823, at *3 (Ohio App. Dec. 11, 2009) ("The issues regarding duty of care owed in the instant case are not of a complex nature involving industry standards or policy interpretation. A jury is able to determine if the insurance agent violated a duty of care owed to Formoso without expert testimony.").

Ohio case law indicates that Plaintiff is not required to provide an expert witness for all of the alleged breaches at issue in his negligence claim. For example, insurance brokers owe "an easily understood duty to use reasonable care when communicating about the facts of the premium calculation." *Burlington Ins. Co.*, 936 N.E.2d at 118. UIG's argument that the many uncertainties in this action, including the actual premium and the density of the policies and illustrations, demonstrates that Plaintiff will indeed need an expert witness. Admittedly, this argument does have some level of intrinsic and superficial appeal. However, the Court declines to dismiss Plaintiff's negligence claim in its entirety because the parties have presented a convoluted recitation of the underlying facts. The Court will defer a nuanced analysis of which specific claims will require expert testimony until the parties properly address that issue.

### 2. *Failure to read policy*

UIG cites several Ohio courts that have held that an insurance customer "has a corresponding duty to examine the coverage provided and is charged with knowledge of the contents of his or her own insurance policies." *Fry v. Walters & Peck Agency, Inc.*, 750 N.E.2d 1194, 1200 (Ohio App. 2001). Under this approach, failure to read the policy precludes a claim for negligence or negligent misrepresentation. *Island House Inn, Inc. v. State Auto Ins. Cos.*, 782 N.E.2d 156, 159 (Ohio App. 2002) ("David Waleri apparently did not examine his policy. Consequently, he cannot now be heard to complain that the

loss is due to his insurance agent's failure to properly advise him.").[20]

Other Ohio appellate courts have rejected the approach that failure to read an insurance policy forms a complete bar to a negligence or negligent misrepresentation claim. Accordingly, an insured's "failure to read the policy is typically the subject of a comparative negligence defense which is generally addressed at trial and not on a motion for summary judgment." *Gerace Flick v. Westfield Nat. Ins. Co.*, No. 01 CO 45, 2002 WL 31168883, at *9 (Ohio App. Sept. 26, 2002). More recent Ohio appellate decisions indicate that the trend is towards the rule that an insured's failure to read the policy is an issue of comparative negligence issue reserved for the finder of fact. *See Robson v. Quentin E. Cadd Agency*, 901 N.E.2d 835, 841-45 (Ohio App. 2008) (surveying both approaches and ultimately adopting the comparative negligence rule).[21]

The Court need not definitely choose, however, because Plaintiff testified that he did read the revised illustration on August 7, 2012 and asked Robinson specific questions about the various premiums listed. (Doc. 40 at 100-03, 164-68). Plaintiff testified that Robinson told him that the policy would issue with a premium payment of approximately $4,500. (*Id.*) This closely matches the $4,406.81 Short-Term Level Premium listed in

---

[20] *See also Craggett v. Adell Ins. Agency*, 635 N.E.2d 1326, 1332 (Ohio App. 1993) ("[A] person has a duty to examine the coverage provided and is charged with knowledge of the contents of her own insurance policies. An agent or broker is not liable when a customer's loss is due to the customer's own act or omission." ).

[21] *See also Britton v. Gibbs Associates*, No. 08CA9, 2009 WL 2436607, at *4 (Ohio App. July 29, 2009) ("[A]n insured's failure to read their policy is not an absolute bar to recovery. We recently stated that an insured's failure to read their policy is a matter of comparative negligence and is an issue to be decided by the trier of fact.").

the revised illustration.  (*Id.*, Ex. H at 13).  Robinson's purported explanation that the higher premium reflected the amount if Plaintiff wished to over-fund the policy could cause a reasonable jury to find for Plaintiff.[22]  Additionally, when Wickes informed Plaintiff that he owed a premium of $1,270.96 for September 2012, Plaintiff asked Wickes to explain that number because it was not listed in his policy illustration.  (Doc. 44, Ex. 21).  Wickes could not explain why Omaha requested this premium at the time and Wickes could not explain it at his deposition.  (*Id.* at 109-10).  Robinson was similarly unable to explain the number at her deposition.  (Doc. 43 at 105).  Further, there is no evidence in the record that Plaintiff was provided with an updated policy illustration after Robinson changed his payment mode to monthly in late August 2012.  (Doc. 43, Ex. 16).

Plaintiff testified that he made an affirmative and specific inquiry to Robinson about the terms of the policy illustration after he read it.  *See Fry*, 750 N.E.2d at 1201 (holding that "absent specific inquiry by the insured, Walters [the insurance agent] had no duty to explain the coinsurance clause").  Accordingly, a reasonable jury could conclude that Plaintiff did read his policy and that the policy did not obviously provide the answer.

---

[22] *See Merrill v. William E. Ward Ins.*, 622 N.E.2d 743, 748-49 (Ohio App. 1993) ("[P]laintiffs presented evidence indicating that the insured, Samuel English, sought information from his insurance agent regarding the identity of his beneficiaries.  Ward's duty of care, acting in his capacity as an insurance agent for his client, Samuel English, was to exercise reasonable care to provide accurate representations about existing information which was ascertainable by him.").

## D. Negligent Misrepresentation and Fraudulent Inducement

The elements of the tort of negligent misrepresentation are as follows:

"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989) (quoting of 3 Restatement (Second) of Torts § 552(1) (1965))).

The elements of a claim for fraudulent inducement are:

(1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (3) intent to induce reliance on the representation; (4) justifiable reliance; and (5) injury proximately caused by the reliance.

*Info. Leasing Corp. v. Chambers*, 789 N.E.2d 1155, 1174 (Ohio App. 2003). Fraudulent inducement must be proven by clear and convincing evidence. *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 768 N.E.2d 619, 628 (Ohio App. 2002).

Plaintiff's claims for negligent misrepresentation and fraudulent inducement are based on Robinson's and Wickes' alleged statements that the annual premium was approximately $4,500. UIG argues that "no reasonable juror could conclude that a party with a vast resume of business acumen, who clearly assented to an $8,753 premium, justifiably relied on an initial quote of $4,200 prior to his parents' medical examinations

52

as the annual premium."  (Doc. 39 at 28).  Further, UIG contends that Plaintiff "cannot

point to any document showing an annualized premium of $4,200."  (*Id.* at 22).

Reliance is "justified if the representation does not appear unreasonable on its face

. . . and if, under the circumstances, [there is] no apparent reason to doubt the veracity of

the representation."  *Lu-An-Do, Inc. v. Kloots*, 721 N.E.2d 507, 514 (Ohio App. 1999).  In

*Carpenter*, 733 N.E.2d 1196, the plaintiffs alleged that an insurance agency negligently

or intentionally misrepresented the price of insurance.  *Id.* at 1204-05.  The insurance

agency contended that the quote was only tentative, so the agency could not have made

an actionable false statement.  *Id.*  Based on the evidence presented by the insureds, the

court held that summary judgment was not appropriate:

> In their depositions and in their affidavit in opposition to summary
> judgment, the Carpenters assert that there was nothing tentative about
> Scherer-Mountain's quote.  According to the Carpenters, Scherer-Mountain
> represented that $220 was the *actual* quote for a $75,000 flood insurance
> policy.  Further, the Carpenters presented summary judgment evidence that
> Scherer-Mountain accepted payment of $220 for what they believed to be a
> $75,000 flood insurance policy.  In light of these contentions by the
> Carpenters, there remains a genuine issue of fact of whether Scherer-
> Mountain negligently or intentionally misrepresented the price of flood
> insurance to the Carpenters.

*Id.*

Here, Plaintiff has presented similar evidence that is sufficient to create a material

factual dispute.  Plaintiff's testimony is that Robinson pointed to the $4,406.81 Short-

Term Level Premium listed in the revised illustration and told him that this was the

premium he was required to pay.  (Doc. 40 at 100-03, 164-68).  This matched prior verbal

representations she had made.  (*Id.*)  In September 2012, Wickes told Plaintiff via text

message that Plaintiff could "fund as low as 367 per mth. 755 is the desired amount for the policy to work correctly." (Doc. 44, Ex. 21 at 6). A reasonable jury could find that Plaintiff justifiably relied on the premium listed in the revised illustration and the explanation from Robinson that the higher premiums were only if Plaintiff wished to over-fund the policy.[23]

Finally, Plaintiff has produced a letter from Omaha stating that it stopped processing Plaintiff's application because he failed to pay the "initial premium of $4,293.20." (Doc. 43, Ex. 19). UIG makes no reference to this letter or the premium in its briefs. Robinson and Wickes were unable to explain why Omaha indicated this was the initial premium. (Doc. 43 at 107; Doc. 44 at 123-24). After months of discovery and the production of numerous policy illustrations and documents, the Court is still unable to determine the premium that Omaha actually charged to Plaintiff. The record contains a number of additional factual disputes that only the finder of fact can resolve. Accordingly, UIG has not carried its burden to establish that it is entitled to judgment as a matter of law.

## VI.     CONCLUSION

Wherefore, for these reasons, Defendant United Insurance Group Agency, Inc.'s Motion for Summary Judgment (Doc. 39) is **DENIED**.

---

[23] *Roberts v. Maichl*, No. C-040002, 2004 WL 1948718, at *3 (Ohio App. Sept. 3, 2004) ("Roberts could not argue that he had justifiably relied upon the representation by SKS that the companies were adequately insured, where Roberts himself admitted he had not read his insurance policies, which made no reference to employee-dishonesty coverage.").

**IT IS SO ORDERED**.

Date: 8/11/15                                    *s/ Timothy S. Black*
                                                                      Timothy S. Black
                                                                       United States District Judge