UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| VAN STICKNEY, | : | Case No. 3:13-cv-235 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| UNITED INSURANCE GROUP AGENCY, INC., | : | |
| Defendant. | : | |

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION *IN LIMINE* AS TO DAMAGES (Doc. 62)**

This civil action is before the Court on Plaintiff's motion *in limine* as to damages (Doc. 62) and the parties' responsive memoranda (Docs. 70, 72).

On July 22, 2013, Plaintiff Van Stickney brought this civil action against United Insurance Group Agency, Inc. ("UIG") and United of Omaha Life Insurance Company ("Omaha"), alleging six claims for relief: (1) negligence; (2) breach of fiduciary duty; (3) negligent misrepresentation; (4) fraudulent inducement; (5) reformation of contract; and (6) breach of contract. (Doc. 1). On January 20, 2015, Plaintiff settled his claims against Omaha. (Doc. 50). Accordingly, the reformation and breach of contract claims, which were asserted against Omaha only, were dismissed, and the remaining four claims are now pending solely against UIG.

## I. BACKGROUND

In 2005, Plaintiff purchased a last-to-die life insurance policy from Pacific Life Insurance Company (the "Pac Life policy"). (Doc. 40 at 57-58). The Pac Life policy had an annual premium of $5,470 and a $750,000 death benefit, payable after both of his parents passed away. (*Id*. at 58). The Pac Life policy also accumulated a cash value through an investment component, which varied based on the market interest rate. (Doc. 39, Ex. D at ¶ 7; Doc. 40 at 66; Doc. 69 at 7).

In 2011, Plaintiff applied to Omaha for a Joint and Last Survivor Flexible Premium Adjustable Life Insurance Policy as a replacement for the Pac Life policy. Plaintiff applied for the policy through Heidi Robinson and David Wickes, independent insurance agents authorized to sell Omaha policies and associated with UIG. Over the course of several months, Robinson and Wickes provided Plaintiff with multiple policy illustrations and eventually delivered a Joint and Last Survivor Flexible Premium Adjustable Life Insurance Policy number BU1371786.

Plaintiff testified that he initially consulted Robinson to see if he could get a life insurance policy on his parents with a $750,000 death benefit for less than the $5,400 he was paying for the Pac Life policy. (Doc. 40 at 63-64, 75). Plaintiff testified that he made clear to Robinson and Wickes that he did not want to pay more money than he was paying on his Pac Life policy. (*Id.* at 88). Robinson and Wickes testified, however, that Plaintiff only asked them "if he could do better" than the Pac Life policy. (Doc. 43 at 34-35, 37, 40-41; Doc. 44 at 32-35, 37).

Plaintiff submitted his Omaha application on December 22, 2011. (Doc. 40 at 95-96, Ex. A). Plaintiff requested a $750,000 death benefit and a $333.12 monthly premium. (*Id.*, Ex. A at 1). Plaintiff indicated on the application that he was applying for the policy to replace the Pac Life policy through a tax-free 1035 exchange. (Doc. 40, Ex. A at 2; Doc. 43 at 63). Further, Plaintiff wrote on the application that he sought to replace his Pac Life policy because it was "too expensive." (Doc. 40, Ex. A at 17).

On April 18, 2012, Robinson received an email from Omaha in response to Plaintiff's application. (Doc. 43, Ex. 6). The email indicated that Plaintiff's parents had both been "rated up" based on their medical records. (Doc. 43 at 72). This meant that the insureds would not qualify for the preferred rating indicated on the application. (*Id.*, Ex. 6). The email from Omaha did not state the new premium, but Robinson and Wickes could determine that based on the new ratings. (*Id.* at 72; Doc. 44 at 68). Robinson called Plaintiff to tell him that his parents had been rated up and testified that Plaintiff understood that the policy would be more expensive, but Robinson did not tell Plaintiff what the new premium was during that phone call. (*Id.* at 72-73).

On April 22, 2012, Plaintiff met with Robinson and Wickes at the UIG office in Columbus to discuss the policy offer from Omaha. (Doc. 43 at 76). Plaintiff testified that Robinson told him that the premium with Omaha was lower than the premium on his Pac Life policy. (Doc. 40 at 97). Plaintiff could not recall the exact amount that Robinson told him, but estimated that Robinson said the premium would be approximately $4,500. (*Id.*) Plaintiff understood that the premium would be higher

because his parents were rated up, but testified that Robinson told him the premium had only increased from $4,200 to $4,500. (*Id.*)

Robinson testified that Wickes prepared a new illustration in advance of an April 2012 meeting and that she explained to Plaintiff the new premium would be approximately $8,700. (Doc. 43 at 74-76). However, a copy of this illustration is not part of the record.

On June 11, 2012, another policy illustration was created. (Doc. 43, Ex. 9). The June 2012 illustration provided for a $750,000 death benefit and rated Plaintiff's father as table 2(B) 150% and Plaintiff's mother as standard non-tobacco. (*Id.*) The Premium Outlay was $8,753.33 and the Payment Mode was annual. (*Id.* at 8). The illustration also provided that the 1035 Exchange Amount was $23,157, and this was added to the Premium Outlay to create an Annualized Premium Outlay of $31,910 in policy year 1, which was reflected in the comprehensive table. (*Id.* at 9). The Annualized Premium Outlay for all other policy years was $8,753. (*Id.*) The Lifetime Level Premium was $8,753.33 and the Short-Term Level Premium was $4,543.02. (*Id.* at 4, 12).

On July 19, 2012, Omaha created a revised policy illustration and forwarded it to Robinson, through UIG. (Doc. 40, Ex. H; Doc. 44 at 85). Plaintiff testified that he read the July 2012 revised illustration and specifically asked Robinson to explain the difference between the Premium Outlay of $8,753.33, Lifetime Level Premium of $8,566.74, and Short-Term Level Premium of $4,406.81 that were listed on the final page. (Doc. 40 at 100-03, 164-68, Ex. H at 13).

> Plaintiff testified:
>
> [B]efore I signed any documents, I seen to where we have different numbers that are skewed from the top of the page. We have at the very top of the page $8,753.33 where it says premium outlay. Then where it says Lifetime Level Premium right underneath the line that says $8,566.74, which is different from the premium outlay. And then there was this Short-Term Level Premium $4,406.81. I questioned to Robinson, I said, time out. I'm being told the 44, $4,500 number, I'm seeing three different numbers here. What is my annual premium that I am going to pay year in, year out? Because I see on the other page that it's different than what you're telling me. These numbers here are different to where I wanted to know what's short-term, what's lifetime, what the premium outlay. There's too much going on.
>
> And I said, is this going to cost me more or less than what I'm paying? What am I going to pay for the life insurance? This is when I'm going back to this $4,400 that's on [Bates number] 116 pointing to Short-Term Level Premium, because she was also explaining along with David Wickes, which was in meetings, that you can over fund a policy to where there is a minimum to sustain a policy and then you can over fund a policy if you needed to put money in for tax purposes. So I wanted to make sure what level am I talking about when I'm paying for a premium outlay for $750,000, because I knew I wasn't going to pay any more than what I was paying with Pac Life. And I wanted to know clarity. She verbally told me this $4,400.

(*Id.* at 164-65).

Plaintiff signed the July 2012 revised illustration on August 7, 2012 (Doc. 40, Ex. D) and gave Robinson a $400 premium check on that day. (Doc. 43, Ex. 14).

Throughout August to December 2012, the parties engaged in extended back-and-forths about how much further premium needed to be paid when.

On December 21, 2012, Omaha mailed a letter to Plaintiff stating that it had discontinued the processing of his application. (Doc. 43, Ex. 19). The letter stated: "The following requirements are still outstanding: initial premium of $4,293.20…."

5

Ultimately this civil action followed, with Plaintiff seeking recovery of "the value of the Pac Life Policy which [Defendant] deprived him of, or the value of the Omaha policy which [Defendant] failed to secure" … reduced by the value of the replacement Lincoln policy. (Doc. 62 at 7). Defendant responds that because Plaintiff could have maintained his level of coverage by paying the Omaha policy's premium (despite its substantially higher cost), Plaintiff should not be permitted to recover any loss resulting from his failure to maintain the Omaha policy. (Doc. 70).

## II. STANDARD OF REVIEW

"Motions in limine are generally used to ensure evenhanded and expeditious management of trials by eliminating evidence that is clearly inadmissible for any purpose." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) (citation omitted). Similar to other evidentiary rulings, the decision to grant or deny a motion *in limine* is within the sound discretion of the trial court. *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 852 (7th Cir. 1998). However, "[o]rders *in limine* which exclude broad categories of evidence should rarely be employed." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). Ultimately, "[a] ruling on a motion *in limine* is no more than a preliminary, or advisory, opinion that falls entirely within the discretion of the district court." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994). Moreover, because *in limine* rulings are advisory in nature, a court may alter its ruling during the course of the trial. *Luce v. United States*, 469 U.S. 38, 41-42 (1984).

## III. ANALYSIS

In his motion *in limine*, Plaintiff seeks a ruling that: (1) Plaintiff "may present evidence and argument pertaining to his future damages, including the value of a life insurance policy"; (2) Plaintiff may present evidence and argument "pertaining to damages for adverse tax consequences"; (3) Defendant "may not present evidence or argument pertaining to any right of setoff"; and (4) Defendant may not present evidence "pertaining to [Plaintiff's] failure to mitigate [his damages]." (Doc. 62 at 4).

### A. Plaintiff's Evidence of Future Damages

First, Plaintiff "requests that the Court delimit the proper boundaries of damages in this case." (Doc. 62 at 4). In other words, Plaintiff asks the Court to determine the applicable method of computing damages in the instant case. In response, Defendant argues that Plaintiff's request is akin to seeking an "advisory opinion on his damage theory," and is outside the scope of a motion *in limine*. (Doc. 70 at 2-3). Alternatively, Defendant argues that Plaintiff's theory improperly computes future damages and should not be admissible at trial. (*Id*. at 3-6).

#### *1. Value of the Life Insurance Policy*

As an initial matter, "[i]n Ohio, a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future." [1]

---

[1] However, the Court notes that "[u]nder the common law of Ohio, future damages must be reduced to present value, and a defendant is entitled to a jury instruction to that effect … Thus in Ohio, a jury is to return a verdict not in an amount reflecting the actual damages it deems to be reasonably certain to occur in the future, but rather in a reduced amount representing the present value of those actual damages." *Galayda v. Lake Hosp. Sys., Inc.*, 644 N.E.2d 298, 301 (Ohio 1994) (internal citations omitted).

*Galayda*, 644 N.E.2d at 301 (citations omitted). Specifically, Plaintiff must show both the amount *and* existence of the damages with reasonable certainty. *City of Gahanna v. Eastgate Prop., Inc.*, 521 N.E.2d 814, 818 (Ohio 1988). If Plaintiff is unable to make such a showing, his future damages will reflect accordingly. However, the Court finds no reason at this time to preclude Plaintiff from presenting at trial his evidence of future damages. *Sperberg*, 519 F.2d at 712 ("Orders *in limine* which exclude broad categories of evidence should rarely be employed.").

Here, to calculate his future damages, Plaintiff seeks to present evidence valuing the life insurance policies. (Doc. 62 at 6-7). Specifically, Plaintiff argues that he "should be permitted to receive the value of the Pac Life policy which [Defendant] deprived him of, or the value of the Omaha policy which [Defendant] failed to secure." (*Id*. at 7). More accurately, Plaintiff's damage theory proposes an award equal to the value of either the Pac Life policy or the Omaha policy, reduced by the value of the Lincoln policy.

Conversely, Defendant argues that Plaintiff's damages should be limited to the difference between the Omaha policy's higher annual premium and the lower premium of the Pac Life policy.[2] (Doc. 70 at 3-6). Defendant asserts that this calculation is appropriate because "[Plaintiff] knew that he would have increased costs to keep $750,000 of coverage, roughly $3,600 a year … [but] Plaintiff never made this payment to Omaha during the next three months, and his policy was thus cancelled." (*Id*. at 6). In other words, Defendant argues that because Plaintiff could have maintained his level

---

[2] Defendant states that the Omaha policy's annual premium was $8,753.33. (Doc. 69 at 10; Doc. 70 at 6). As previously stated, the annual premium for the Pac Life policy was $5,470.

8

of coverage simply by paying the Omaha policy's premium (despite its substantially higher cost), he should not be permitted to recover any loss resulting from his failure to do so.

The Court finds that the appropriate theory of damages is likely contingent upon the factual findings of the jury. If the jury finds that Plaintiff could have, and should have, continued to make payments under the Omaha policy, then Defendant's mitigation of damages calculation may be appropriate. However, if the jury finds that Plaintiff did not fail to mitigate damages, then Plaintiff's calculations are likely appropriate. Further, under Plaintiff's calculation, whether the value of the Pac Life policy or the Omaha policy should be used apparently depends on whether the jury finds that Plaintiff's decision to change his policy was driven by Defendant's misrepresentations.

As the appropriate damage calculation is likely subject to the factual findings of the jury, the Court will not, at this time, limit the evidence to be presented. Accordingly, Plaintiff's evidence regarding valuation of the life insurance policies is not prohibited from admission at trial.

### 2. Tax Consequences

Plaintiff argues further that he is entitled receive "a component of damages designed to compensate [him] for adverse tax consequences." (Doc. 62 at 8). Plaintiff's motion, however, focuses on the *applicability* of such an award rather than the *admissibility* of related evidence. A motion *in limine* is not the appropriate vehicle for deciding whether Plaintiff is entitled to a "tax gross-up" on his potential damage award. However, it bears noting that "[c]ourts generally do not gross-up damage awards to take

9

into account the plaintiff's tax liability on the award .…" *Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 521 (2004) (emphasis added).

Whether an award of damages is taxable as income is based on the underlying nature of the claim. *Brown v. United States*, 526 F.2d 125, 138-39 (6th Cir. 1975) (holding that "the origins of [the] litigation" determine how items are categorized for tax purposes).[3] Pursuant to 26 U.S.C. § 63, the term 'taxable income' is defined as "gross income" minus certain deductions. "[G]ross income means all income from whatever source derived," except for certain items which are specifically excluded under the statute. 26 U.S.C. § 61(a). For instance, "gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured." 26 U.S.C. § 101(a).

Here, should Plaintiff prevail at trial, any damages awarded will compensate him for the proceeds he would have otherwise received from the either the Pac Life or Omaha policies. Accordingly, based on the origins of the litigation, and although the Court does not give tax advice, it appears that such an award would not constitute taxable income pursuant to Title 26 of the United States Code. *See supra*. Indeed, Plaintiff conceded this fact in his motion *in limine*, stating expressly that "life insurance proceeds are **not taxable**." (Doc. 62 at 8) (emphasis added).

---

[3] *United States v. Gilmore*, 372 U.S. 39, 50 (1963) (in determining whether legal expenses are tax deductible, the court looks to "the origin and character of the claim with respect to which [the] expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer"); *Braddock v. United States*, 434 F.2d 631, 632 (9th Cir. 1970) ("it is immaterial that appellant received the money by reason of a compromise settlement. It is the nature of the underlying claim which governs").

10

Accordingly, Plaintiff's subsequent argument that he "plans to present the testimony of his accountant who – in real life – is counseling [Plaintiff] to include any litigation proceeds in his taxable income" is irrelevant, as the consequences of the award do not alter the origins of the litigation.  *See Gilmore*, 372 U.S. at 50.  Further, to the extent that there is some dispute as to whether the potential damages awarded may be categorized as taxable income, the Court finds that such uncertainty renders the requested 'tax gross-up' too speculative to award as within future damages.  *See Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 521 (2004).

Thus, as the only determination to be made here regarding tax consequences is legal rather than factual, the Court finds that related evidence is likely to cause unnecessary confusion and delay.  Accordingly, Plaintiff will not be permitted to present evidence to the jury as to potential negative tax consequences.

### B. Defendant's Evidence of Right to Setoff and Failure to Mitigate

Plaintiff also moves for a preliminary ruling to exclude certain evidence relating to damages, including right to setoff and failure to mitigate.  (Doc. 62).  Defendant argues that such evidence is relevant to the jury's determination of damages.

#### *1. Right to Setoff*

Plaintiff argues that Defendant should not be permitted to present evidence of its possible setoff from the settlement between Plaintiff and Omaha.  (Doc. 62 at 8-9). Plaintiff argues that because there has been no determination regarding Omaha's liability, Defendant is not entitled to a right to setoff.  (*Id.*; Doc. 72 at 11-13).  Defendant argues

that the correct standard for determining the right to setoff is merely whether the Omaha settlement was paid for the "same injury or loss" as the present dispute. (Doc. 70 at 8-9).

Ultimately, the applicable standard for a right to setoff is a legal determination. Therefore, related evidence is not relevant to the jury's factual findings and may be unduly prejudicial. Accordingly, evidence relating to the right to setoff will not be admissible at trial for the purpose of showing that Plaintiff has already been compensated.

However, the Court will apply the set-off, if warranted.[4]

### 2. *Mitigation of Damages*

Plaintiff seeks a preliminary ruling that Defendant should not be permitted to present evidence or argument that Plaintiff failed to mitigate damages. (Doc. 62 at 9-11). However, as the Court discussed in Section III(A)(1), *supra*, whether Plaintiff had a duty to mitigate his damages by paying the Omaha policy's higher premium is relevant to the jury's determination of damages.

Accordingly, the Court declines to limit either party from presenting relevant evidence or arguments relating to the damage computation.[5]

---

[4] It seems apparent that the settlement paid by Omaha was for the same injury or loss as the present dispute. And surely the law abhors a double recovery or windfall.

[5] It may seem outright incredible to some to accept that because Plaintiff could have maintained his level of coverage simply by paying the Omaha policy's premium (despite its substantially higher cost), he should not be permitted to recover any loss resulting from his decision to not keep paying, but, instead, to walk away from the Defendant's agents whom he ultimately concluded were fleecing him.

## IV.  CONCLUSION

Based upon the foregoing, Plaintiff Van Stickney's motion *in limine* as to damages (Doc. 62) is granted in part and denied in part as set forth in this Order**.**

**IT IS SO ORDERED**.

Date:  11/16/15              *s/ Timothy S. Black*
                                           Timothy S. Black
                                           United States District Judge